Attorney Grievance Commission of Maryland v. Joseph Ignatius Cassilly, Misc. Docket AG No. 31, September Term, 2020

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT –** Court of Appeals disbarred lawyer who, in his capacity as prosecutor, knowingly and intentionally failed to disclose for more than decade exculpatory evidence that came to light after defendant's conviction, discarded evidence, sought to have forensic evidence in case destroyed, knowingly made false statements of fact to court and defense counsel concerning content of evidence, and, during Bar Counsel's investigation, failed to comply with subpoena to provide statement under oath. Such conduct violated Maryland Lawyers' Rules of Professional Conduct/Maryland Attorneys' Rules of Professional Conduct 3.3(a)(1) (Candor Toward Tribunal), 3.4(a) (Fairness to Opposing Party and Counsel), 3.8(d) (Special Responsibilities of Prosecutor), 8.1(b) (Failing to Respond to Lawful Demand for Information), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), 8.4(d) (Conduct that is Prejudicial to Administration of Justice), and 8.4(a) (Violating Rules of Professional Conduct).

Circuit Court for Harford County
Case No. C-12-CV-20-000648

Argued: September 9, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 31

September Term, 2020
_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JOSEPH IGNATIUS CASSILLY
_____

Getty, C.J.
McDonald
Watts
Hotten
Booth
Biran
Battaglia, Lynne A. (Senior
Judge, Specially Assigned)

JJ.
_____

Opinion by Watts, J.
Concurring opinion by McDonald, J.
_____

Filed: October 22, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This attorney discipline proceeding involves a lawyer who, in his capacity as a prosecutor, knowingly and intentionally failed to disclose for more than a decade exculpatory evidence that came to light after a defendant's conviction, discarded the evidence, knowingly made false statements of fact to a court and defense counsel concerning the content of the evidence, opposed the defendant's postconviction[1] petitions and sought to have forensic evidence that was the subject of the defendant's post-trial request for review destroyed, and, during Bar Counsel's investigation, failed to comply with a subpoena to provide a statement under oath.

Joseph Ignatius Cassilly, Respondent, a member of the Bar of Maryland, served as an Assistant State's Attorney in Harford County from 1977 until January 3, 1983, at which time he became the elected State's Attorney for Harford County, a position he served in until his retirement in January 2019. Beginning in 1981, in his capacity as an Assistant State's Attorney and later as the State's Attorney, Cassilly represented the State in prosecuting John Norman Huffington for the murder of two people. As State's Attorney, Cassilly represented the State in various postconviction proceedings in Huffington's case and after many years of such proceedings, in 2018, Huffington filed a complaint against Cassilly with Bar Counsel.

On September 8, 2020, on behalf of the Attorney Grievance Commission, Petitioner, Bar Counsel filed in this Court a "Petition for Disciplinary or Remedial Action" against

---

[1]For purposes of this opinion, when we use the word "postconviction," we are not referring exclusively to a petition filed under the Uniform Postconviction Procedure Act, Md. Code Ann., Crim. Proc. (2001, 2018 Repl. Vol.) §§ 7-101 to 7-301. The term encompasses a variety of petitions for relief that a defendant may file after conviction.

Cassilly, charging him with violating Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and Maryland Attorneys' Rules of Professional Conduct ("MARPC") 3.3(a)(1) (Candor Toward the Tribunal), 3.4(a) (Fairness to Opposing Party and Counsel), 3.8(d) (Special Responsibilities of a Prosecutor), 8.1(a) (False Statement of Material Fact), 8.1(b) (Failing to Respond to a Lawful Demand for Information), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), 8.4(d) (Conduct that is Prejudicial to the Administration of Justice), and 8.4(a) (Violating the Rules of Professional Conduct).[2]

On September 17, 2020, this Court designated the Honorable Barbara K. Howe ("the hearing judge") to hear the attorney discipline proceeding in the Circuit Court for Harford County. On February 3, 4, and 5, 2021, the hearing judge conducted a remote hearing via Zoom for Government.[3] On March 10, 2021, the hearing judge filed in this Court an opinion including findings of fact and conclusions of law, concluding that Cassilly had violated Rules 3.3(a)(1), 3.4(a), 3.8(d), 8.4(c), 8.4(d), and 8.4(a), but had not violated Rule

---

[2]Prior to July 1, 2016, the MLRPC were contained in an appendix to Maryland Rule 16-812. Effective July 1, 2016, the MLRPC were renamed the MARPC and relocated to Title 19 of the Maryland Rules and renumbered, without substantive change. See Md. R. 19-300.1 to 19-308.5. The misconduct at issue in this case occurred both before and after the change. Because both versions of the Rules are applicable and there is no substantive difference between the two, in this opinion, we refer to the charged violations, including those that are alleged to have occurred after July 1, 2016, by the form used in the MLRPC (*e.g.*, MLRPC/MARPC 3.3(a)(1) will be referred to as Rule 3.3(a)(1)).

[3]Pursuant to an Administrative Order of March 13, 2020, due to the COVID-19 emergency, Maryland courts were closed; and certain mandatory/emergency matters were designated to continue to be scheduled and heard either in person or remotely. Pursuant to an Administrative Order of June 3, 2020, the Judiciary began a progressive resumption of operations including the scheduling and hearing of Attorney Grievance Commission cases, with the continued authorization to conduct remote proceedings.

8.1.[4]

On September 9, 2021, we heard oral argument. For the below reasons, we disbar Cassilly.

## BACKGROUND

The hearing judge found the following facts, which we summarize.

On June 28, 1977, this Court admitted Cassilly to the Bar of Maryland. Cassilly served as an Assistant State's Attorney in Harford County, Maryland from 1977 until January 3, 1983, when he was sworn in as the elected State's Attorney for Harford County. Cassilly served as the State's Attorney for Harford County from that date until his retirement in January 2019. After retiring, Cassilly voluntarily assumed "inactive/retired" status pursuant to Maryland Rule 19-605(b).[5]

### State v. John Norman Huffington

#### *First Trial*

On May 25, 1981, Diane Becker was found murdered in her trailer in Harford County. The body of Joseph Hudson, Jr., Becker's boyfriend, was found on a dirt road nearby. Hudson had been shot several times.

---

[4]Although the hearing judge did not specify which section of Rule 8.1 Cassilly had not violated, it is evident from the circumstances involved that the hearing judge concluded Cassilly had not violated Rule 8.1(b), which proscribes a knowing failure to respond to a lawful demand for information from Bar Counsel. At oral argument in this Court, Deputy Bar Counsel advised that Petitioner is not pursuing the charged violation of Rule 8.1(a). As such, we do not address the matter.

[5]Maryland Rule 19-605(b)(1) provides: "The trustees of the [Client Protection] Fund may approve attorneys, other than attorneys on permanent retired status pursuant to Rule 19-717.1, for inactive/retired status, and, by regulation, may provide a uniform deadline date for seeking approval of inactive/retired status."

On June 16, 1981, a grand jury in Harford County indicted Huffington on two counts of first-degree murder and related offenses in connection with the deaths of Becker and Hudson. On July 28, 1981, the grand jury also indicted a person named Deno C. Kanaras on two counts of first-degree murder and related offenses in connection with the deaths. Kanaras admitted that he was present at the time of the murders but alleged that it was Huffington who murdered Becker and Hudson.

Huffington and Kanaras were tried separately. At Huffington's request, venue was transferred to the Circuit Court for Caroline County. Huffington's trial occurred from November 3 to 13, 1981. Assistant State's Attorney Gerard S. Comen served as lead counsel with Cassilly serving as second chair. Huffington was represented by the Office of the Public Defender. At trial, Kanaras testified as a witness on the State's behalf. Huffington was convicted of two counts of felony murder and was sentenced to death. Huffington appealed and, on December 6, 1982, this Court reversed the judgments of conviction.[6]

### Second Trial

On remand, venue was changed to the Circuit Court for Frederick County. From November 8 through 19, 1983, Huffington's second trial occurred. Cassilly and Comen represented the State again. Kanaras was the only eyewitness to the murders and again testified on the State's behalf. By the time of Huffington's second trial, Kanaras had been convicted of Becker's murder. At the second trial, the State called Federal Bureau of

---

[6]In Huffington v. State, 295 Md. 1, 16, 452 A.2d 1211, 1218 (1982), this Court reversed the judgments of conviction and remanded the case for a new trial.

Investigation ("FBI") Agent Michael P. Malone as an expert in forensic testing to corroborate Kanaras's testimony that Huffington was at the scene of Becker's murder. Agent Malone testified that hair samples recovered from Becker's trailer "microscopically matched the head hairs of Mr. Huffington – that is, they were indistinguishable from Mr. Huffington's head hairs; you could not tell them apart." (Brackets omitted). When asked on cross-examination, Agent Malone acknowledged, though, that microscopic hair comparison cannot be utilized as a means of positive personal identification.

At the conclusion of the trial, Huffington was again convicted of two counts of felony murder for the deaths of Becker and Hudson and sentenced to death. On November 13, 1985, this Court affirmed the judgments of conviction.[7] Thereafter, Huffington filed a series of postconviction motions. On January 13, 1988, David O. Stewart, Esq., entered his appearance on Huffington's behalf. From 1988 until the conclusion of the case in 2017, Huffington was represented by Stewart's law firm, Ropes & Gray, LLC.

On January 8, 1991, the circuit court granted, in part, a petition for postconviction relief and ordered a new sentencing hearing. On April 28, 1992, the circuit court sentenced Huffington to life imprisonment. Huffington filed a second petition for postconviction relief, which was denied, and an application for leave to appeal the denial of the second petition for postconviction relief, which was also denied. In addition, Huffington unsuccessfully petitioned in federal court for a writ of habeas corpus.[8]

---

[7]See Huffington v. State, 304 Md. 559, 596, 500 A.2d 272, 290 (1985).
[8]See Huffington v. Nuth, 140 F.3d 572, 585 (4th Cir. 1998).

In 1981, Alcee Hastings, a judge on the United States District Court for the Southern District of Florida, was indicted on federal charges of conspiracy and obstruction of justice related to an alleged bribery scheme. Hastings was alleged to have accepted $150,000 in exchange for releasing $1.2 million dollars in funds seized from two criminal defendants and reducing the defendants' sentences. Hastings was acquitted. A federal judiciary committee was appointed to investigate an ethics complaint filed against Hastings in connection with the bribery scheme.

In 1985, as part of its investigation, the committee submitted to the FBI Laboratory a broken purse strap that Hastings had offered as evidence during his criminal trial. The FBI assigned Agent Malone to conduct an analysis of the purse strap. Agent Malone believed that the purse strap had been intentionally cut. Agent Malone took the purse strap to William Tobin, a metallurgist working in the FBI Laboratory. While Agent Malone observed, Tobin performed tests on the purse strap using a tensile tester, a device that measures the force necessary to break an object. On October 2, 1985, Agent Malone falsely testified before the committee that he had conducted the tensile test.

The committee determined that Hastings had engaged in misconduct and impeachment proceedings were begun in the United States Congress. Tobin was asked to testify before Congress. In preparing to testify, Tobin reviewed a transcript of Agent Malone's testimony before the committee. As a result, in August 1989, Tobin wrote a memorandum to his section chief raising concerns about Agent Malone's testimony. In the memorandum, Tobin stated that Agent Malone falsely testified that he (Agent Malone)

had performed the tensile test on the purse strap. In addition, Tobin identified other false statements in Agent Malone's testimony that contradicted laboratory findings and instances in which Agent Malone "presented apparently and potentially exculpatory information as incriminating." (Brackets omitted).

### *The 1997 Department of Justice Report*

In April 1997, the Department of Justice ("the DOJ") Office of the Inspector General ("OIG") issued a report entitled "The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases" ("the 1997 Report"). The 1997 Report criticized thirteen FBI Laboratory examiners for a number of issues, including the quality of their work, inaccurate testimony, testimony given beyond their level of expertise, and scientifically flawed and improperly prepared reports. The 1997 Report included a section entitled "Tobin Allegations[,]" which pertained to the investigation of Tobin's allegations against Agent Malone. The 1997 Report stated:

> Based on our investigation, we conclude that Malone, in his 1985 testimony before the Investigating Committee, falsely testified that he had himself performed the tensile test and that he testified outside his expertise and inaccurately concerning the test results. The OIG questioned Malone about Tobin's allegations and, to his credit, Malone agreed with many points that Tobin had raised. Malone maintained, however, that he was justified in giving certain testimony because he was offering his own personal opinions rather than expert opinions. This is not a persuasive rationale for the presentation of inaccurate testimony by a Laboratory examiner.

> Before the Investigating Committee, Malone testified falsely when he responded yes to the question, did you actually, yourself, conduct this test? In his OIG interview, Malone admitted that he was technically wrong in his response but noted that he had been right there when the test was conducted. Malone's presence when the test performed does not justify his inaccurate response to the question whether he actually conducted the test.

Malone's testimony that he conducted the test is particularly egregious, because he proceeded to inaccurately describe how the test was performed and the significance of its results.

* * *

In the Alcee Hastings case, we find that Michael Malone testified falsely and outside his expertise in discussing tensile tests performed by the Laboratory. Moreover, after Tobin raised concerns about Malone's testimony in 1989, then [Scientific Analysis Section]-Chief Kenneth Nimmich failed to assure that the serious allegations of examiner misconduct were appropriately investigated and addressed.

Huffington's counsel received a copy of the 1997 Report.

### *FBI Laboratory Task Force*

In 1997, the DOJ established a task force to analyze disclosure issues related to the OIG's investigation of the FBI Laboratory. On June 18, 1997, Lucy Thompson, a senior attorney assigned to the task force, wrote to Cassilly, enclosing a copy of the 1997 Report, the Tobin memorandum, an article from *The Wall Street Journal* dated April 16, 1997, a letter from Huffington's attorney, Stewart, to the DOJ dated April 24, 1997, and Thompson's June 18, 1997 reply to Stewart. Thompson requested that, after Cassilly reviewed the disclosures, he contact Amy B. Jabloner, who was working with the Criminal Division of the DOJ and was assigned to the task force.[9]

On July 18, 1997, Cassilly spoke with Jabloner concerning Huffington's case. After their discussion, Jabloner drafted a memorandum to her file, stating:

Joseph Cassilly, the State's Attorney who prosecuted the *Huffington* case has decided to wait a while to see if the defense files any post-conviction motions in this case. He had originally requested that an FBI laboratory examiner

---

[9]The hearing judge noted that Jabloner's surname after marriage is Oliver and that she was called as a fact witness by Bar Counsel during the disciplinary hearing.

retest the evidence, but reconsidered and decided to wait to see what the defense will do since it has received a copy of the [1997 R]eport. I informed him that he can still request the scientific review and asked that he write a memo to Sue Hayn if he decides to do so. Cassilly will request copies of the trial transcripts from the [Attorney General]'s office.

### *The Robertson Report*

In connection with the task force, the FBI hired forensic scientists to conduct independent reviews of cases in which the work of examiners criticized by the OIG was material to a conviction. This included Huffington's case. Steve Robertson, a hair and fiber analyst hired by the FBI, was assigned to review Agent Malone's conduct in Huffington's case. Robertson reviewed Agent Malone's July 15, 1981 report in Huffington's case, Agent Malone's bench notes, eighty evidence specimens, and Agent Malone's testimony at Huffington's and Kanaras's trials. On September 16, 1999, Robertson issued a report with findings and conclusions entitled "Independent Case Review Report" ("the Robertson Report"). According to the hearing judge, in the report, Robertson stated that "he was unable to determine whether Agent Malone performed the appropriate tests in a scientifically acceptable manner and that Agent Malone's examination results as set forth in the laboratory report were not supported or adequately documented in the bench notes." With respect to Agent Malone's bench notes, Robertson stated:

> The notes are not dated, are in pencil and have some erasures. Some hair were [sic] deemed unsuitable with no documented reason or explanation. The examiner uses abbreviations that are difficult to interpret. Some questioned hair were [sic] matched or eliminated as coming from the known samples without characterization of the microscopic characteristics observed in these questioned or known hair. The technicians do not document the recovery of any hair from the questioned items.

Robertson found that Agent Malone's testimony was consistent with the laboratory report but inconsistent with his bench notes. In addition, Robertson stated that, based on the 1982 transcript of Kanaras's trial, Agent Malone testified that he personally performed certain tests that he (Robertson) had determined were most likely performed by laboratory technicians.

On October 21, 1999, Thompson wrote to Cassilly concerning the independent scientific review in Huffington's case and enclosed the Robertson Report. At the time, Huffington had exhausted all postconviction remedies. In the letter to Cassilly, Thompson noted that Cassilly had previously been provided with the 1997 Report concerning Agent Malone and summarized the OIG's findings concerning his testimony in the Hastings case, including the OIG's conclusions that Agent Malone's testimony had been incorrect and misleading, that he had testified falsely regarding the tensile test, and that he had been criticized for testifying outside of his expertise and inaccurately as to the results. In the letter, Thompson requested that Cassilly "review the enclosed documents, the OIG report, and any other pertinent information you may have to determine whether the report of the independent scientist should be disclosed to the defendant or to the defendant's counsel."

Cassilly did not provide a copy of the Robertson Report to Huffington's counsel. According to the hearing judge, at the disciplinary hearing, Cassilly testified that he "kept the 1997 Report and the Robertson Report for five years and then discarded them and forgot about them." The hearing judge found that Cassilly did not maintain a copy of either the

1997 Report or the Robertson Report in the State's file.[10]

The hearing judge credited the testimony of Bar Counsel's expert witness, Andrew V. Jezic, Esquire, who was accepted as an expert in criminal law, that the Robertson Report was exculpatory and constituted impeachment material, and that Cassilly was obligated to disclose the Robertson Report. The hearing judge found:

> The definition of exculpatory evidence as provided in Rule 3.8(d) is all evidence or information known to the prosecutor that tends to negate the guilt of the accused. [] Robertson's conclusions that he could not determine whether Agent Malone conducted his testing in a scientifically acceptable manner and that Agent Malone's bench notes were inconsistent with his testimony were relevant to the reliability and credibility of Agent Malone's testimony. As [] Jezic testified, the conclusion that the Robertson Report was exculpatory is bolstered by the information the DOJ provided to [Cassilly] regarding Agent Malone's false testimony in the Hastings case.
>
> [Cassilly] maintains that the disclosure of the Robertson Report was unnecessary because the report was not exculpatory. This Court disagrees. This Court finds that the Robertson Report tended to negate [] Huffington's guilt and was exculpatory. This Court further finds that [Cassilly] had a duty to disclose the Robertson Report to defense counsel and failed to do so.

(Record citations omitted).

### *Petition to Preserve Forensic Evidence and Conduct DNA Analysis*

On August 14, 2003, Huffington filed a "Petition to Preserve Forensic Evidence and Conduct DNA Analysis" seeking, among things, to test "the hairs that were found at trial to be microscopically similar to [] Huffington's hair[.]" At the time of the filing of the petition, Huffington's counsel was unaware of the Robertson Report. On August 28, 2003,

---

[10]The hearing judge rejected Cassilly's testimony that he provided a copy of the Robertson Report to the Innocence Project, finding that "[n]o documentation was presented to affirm this contention."

Cassilly filed an opposition to the petition and requested permission from the circuit court to destroy the forensic evidence in Huffington's case. At the disciplinary hearing, Cassilly testified that he did not remember that there had been a report reviewing Agent Malone's testimony. The hearing judge rejected Cassilly's testimony on this point.

The circuit court denied Cassilly's request to destroy the evidence and granted Huffington's request to conduct DNA testing of the hairs found at the scene that had been matched to Huffington. Cassilly sent the hair samples to Huffington's expert, but the expert was not able to identify which hairs Agent Malone had matched to Huffington. On November 1, 2006, Huffington filed a motion to dismiss the petition to conduct the DNA analysis. The court dismissed the petition and granted Huffington's request that the forensic evidence be preserved.

### *Petition for a Writ of Actual Innocence*

On November 3, 2010, Huffington filed a "Petition for Writ of Actual Innocence." Huffington contended that newly discovered evidence created a significant possibility that the result at trial would have been different. Among other things, Huffington specifically asserted that Agent Malone's hair and fiber analysis and the comparative bullet lead analysis were unreliable. Huffington relied on reports issued by the National Academy of Sciences between 2006 and 2010, which concluded that there is no scientific support for the use of hair comparison for individual identifications in the absence of DNA testing. In addition, Huffington maintained that new evidence had been discovered discrediting Agent Malone as a witness based on the conclusion in the 1997 Report that Agent Malone gave false and misleading testimony in the Hastings case. According to the hearing judge,

- 12 -

Huffington also identified other cases in which he alleged courts had determined that Agent Malone's testimony had been false or misleading and resulted in wrongful convictions.[11]

The hearing judge found that Cassilly "had a heightened duty to disclose the Robertson Report" after Huffington filed the petition because of the information that was available to Cassilly, but not Huffington, that "called into question the credibility of Agent Malone's testimony." Instead, on January 14, 2011, Cassilly had filed a response to the petition, stating: "No evidence has been presented that the conclusion that examiner Malone rendered in court is not correct. References that Malone was found deficient in another case may be impeaching but it does not prove that his observations in this case are incorrect."

At the disciplinary hearing, Cassilly testified that at the time the petition for a writ of actual innocence was filed, he no longer had a copy of the Robertson Report, did not recall the details of the report, did not remember that the FBI performed an independent analysis of Agent Malone's work in Huffington's case, and that there was nothing in the report that challenged Agent Malone's findings. The hearing judge rejected this testimony.

On January 20, 2011, Huffington's counsel wrote to Cassilly, requesting that the State produce "any and all results of investigations or examinations conducted on []

_____

[11]Huffington cited <u>Bradgon v. Malone</u>, 425 F. Supp. 2d 1, 4, 7 (D.D.C. 2006), as a case in which the United States District Court for the District of Columbia rejected Agent Malone's claim of absolute immunity when he "withheld exculpatory evidence and fabricated evidence during his investigation," which, according to Huffington, resulted in the defendant's wrongful conviction. Huffington also cited an article from *The Washington Post* dated March 14, 2010, which, he asserted, stated that Agent Malone's inaccurate hair analysis resulted in a wrongful conviction in another case.

- 13 -

Huffington's body or any of his clothing and/or belongings." In a letter dated January 31, 2011, in response to the request, Cassilly denied having any discoverable materials and advised that he was aware that "the State was always required to furnish the defense with the results of all tests that were performed by the State[.]"

On January 28, 2011, D. Christian Hassell, Ph.D., the Director of the FBI Laboratory, wrote to Cassilly concerning the comparative bullet lead analysis in Huffington's case. In the letter, Dr. Hassell stated that the laboratory reviewed the examiner's testimony regarding the comparative bullet lead analysis in Huffington's case and that the testimony was proper. On February 23, 2011, Cassilly supplemented the State's answer to the petition with Dr. Hassell's letter, asserting that the letter was "relevant to the issues raised[.]" The hearing judge found "that the Robertson Report was similarly relevant to the issues raised."

On March 30, 2011, the circuit court held a hearing on the petition for a writ of actual innocence. At the hearing, Cassilly stated:

> Now let me just talk a little bit about some of the scientific evidence here, all right? Because, again, they're completely mischaracterizing what was said. Michael Malone, there was an FBI investigation about Mr. Malone's credibility and that did come out and we did receive a letter from the FBI indicating that they had reviewed Malone's testimony in this case and that they concluded that his testimony was appropriate, that he did not overstate the case. Sim, similar letter to the one that you got with respect to the bullet, to the bullet and lead analysis. Unfortunately I, given the length of time was not able to locate that letter. But that's the same kind of letter that we got with respect to Mr. Malone.[12]

---

[12]The transcript of the March 30, 2011 hearing demonstrates that, when addressing the circuit court, after making the statement above, Cassilly stated: "With respect to, and, and although Malone subsequently was found to have perjured himself, there's no, there's

The hearing judge found that Cassilly's statements to the circuit court at the hearing "were knowingly and intentionally false" as

> [t]he Robertson Report concluded that: (1) [] Robertson was unable to determine whether Agent Malone performed the appropriate tests in a scientifically acceptable manner; (2) the results of Agent Malone's examination were not supported by or adequately documented in his bench notes; (3) Agent Malone's testimony was consistent with his report but inconsistent with his bench notes; (4) Agent Malone matched or eliminated some hair without describing the microscopic characteristics observed in the evidence samples and control samples; and (5) Agent Malone deemed some samples unsuitable for comparison without providing a reason.

The hearing judge specifically found that Cassilly's "representation that [] Thompson's letter was similar to Dr. Hassell's letter [was] false and misleading."

At the conclusion of the hearing on the petition for a writ of actual innocence, the circuit court directed Cassilly to determine whether the FBI or State law enforcement laboratories could conduct DNA analysis of the hairs that Agent Malone had identified as a match to Huffington. Approximately one month later, on May 2, 2011, the circuit court wrote to Cassilly and Huffington's counsel and instructed Cassilly to advise by June 3, 2011 of the possibility of obtaining DNA testing.

In the meantime, on April 5, 2011, Huffington's counsel wrote to Cassilly requesting a copy of the letter from the FBI that Cassilly had referenced at the hearing on the petition for a writ of actual innocence. Cassilly responded by e-mail the same day,

---

no evidence today that anything that he said in this trial or that subsequent comparison of the hairs that he made in this trial have been shown to be incorrect." The hearing judge found that this was a knowingly false statement of fact and concluded that Cassilly violated Rule 3.3(a)(1) in making the statement to the circuit court.

stating that if he "could have found it [he] would have had it in Frederick County." Cassilly did not provide any additional information about the letter.

On November 1, 2011, Spencer S. Hsu, a reporter for *The Washington Post*, contacted Huffington's counsel and provided documents that he had received from the FBI and the DOJ in response to a Freedom of Information Act request. The documents that Hsu provided included the July 18, 1997 memorandum of Jabloner, Thompson's October 21, 1999 letter, and the Robertson Report. On November 14, 2011, Huffington filed a "Supplemental Memorandum Presenting Additional Newly Discovered Evidence[,]" advising that, "[u]ntil only a few days ago, Huffington and his counsel were completely unaware that the FBI had assessed Agent Malone's testimony and analysis in his case" and asserting that the State had withheld the evidence for over a decade.

In response to the circuit court's May 2, 2011 directive, Cassilly advised that the FBI could perform DNA testing on the hair samples. On March 27, 2013, the FBI issued a DNA report concluding that Huffington was excluded as the source of the hair at issue.

On May 1, 2013, the circuit court issued a memorandum opinion and order granting the petition for a writ of actual innocence and ordering a new trial. In the opinion, the circuit court stated that the State had "used Agent Malone's testimony as the key piece of evidence to connect [Huffington] to the murder of Diane Becker." The circuit court determined that the Robertson Report was "pertinent and highly relevant," but that the DNA test results rendered moot the need for the court to discuss Agent Malone's testimony. The State appealed, and the case was stayed pending the outcome of the appeal.

## *The 2014 DOJ Letters*

On July 28, 2014, Norman Wong, Special Counsel to the DOJ, wrote to Richard D.

Fritz, the State's Attorney for St. Mary's County, concerning Huffington's case.[13]  In the

letter, in a section titled "Error Identified in this Matter[,]" Wong detailed errors found in

Agent Malone's testimony in Huffington's case, stating:

> We have determined that microscopic hair comparison analysis testimony or
> laboratory report presented in this case included statements that exceeded the
> limits of science and were, therefore, invalid: (1) the examiner stated or
> implied that the evidentiary hair could be associated with a specific
> individual to the exclusion of all others - this type of testimony exceeds the
> limits of the science; (2) the examiner assigned to the positive association a
> statistical weight or probability or provided a likelihood or rareness of the
> positive association that could lead the jury to believe that valid statistical
> weight can be assigned to a microscopic hair association - this type of
> testimony exceeded the limits of the science; or (3) the examiner cites the
> number of cases or hair analyses worked in the laboratory and the number of
> samples from different individuals that could not be distinguished from one
> another as a predictive value to bolster the conclusion that a hair belongs to
> a specific individual - this type of testimony exceeded the limits of the
> science.

With the letter, Wong enclosed the following documents: (1) the FBI Microscopic Hair

Comparison Analysis Review Evaluation Form on which the FBI relied; (2) a

memorandum to the Innocence Project; (3) a response from the Innocence Project agreeing

with the FBI analysis; (4) Agent Malone's original report; and (5) Agent Malone's

testimony from the November 1983 trial.  On the same date, Wong sent an identical letter

to Fritz regarding Kanaras's case with similar documentation.

On July 30, 2014, Fritz forwarded the 2014 DOJ letters to Cassilly.  The hearing

---

[13]The hearing judge pointed out that it is unclear why the DOJ contacted Fritz as neither Huffington's nor Kanaras's trial had occurred in St. Mary's County.

judge found that Cassilly maintained the letters in the State's file but that he had testified at the disciplinary hearing that he did not read them. Cassilly did not provide a copy of the 2014 DOJ letters to Huffington or his counsel. The hearing judge found that Cassilly "had a duty to disclose the letters, as they constituted both exculpatory and impeachment evidence."

### Third Trial

In 2016, the State dismissed its appeal and Huffington's new trial was scheduled for April 3 through 14, 2017. On July 28, 2016, in preparation for trial, Huffington's counsel wrote to Cassilly and requested any communications between the State and any law enforcement agency concerning Huffington, the case, or tests of Huffington's person and/or clothing that tended to exculpate Huffington. Cassilly did not produce the 2014 DOJ letters. The hearing judge found that the 2014 DOJ letters, "in addition to meeting the disclosure requirements of [Maryland] Rule 4-263, were responsive to [] Huffington's discovery request."

On August 18, 2016, the State filed supplemental discovery stating that it had no exculpatory or mitigating evidence. The hearing judge found that Cassilly "knowingly and intentionally failed to produce the 2014 [DOJ] letters." The hearing judge explained:

> Maryland Rule 4-263(d)(5) and (d)(6) required the State to produce any evidence including exculpatory and impeachment evidence. Maryland Rule 4-263(d)(8) required the State to produce the reports of each expert consulted by the State's Attorney in connection with the case. This Court finds that the review of Agent Malone's testimony contained in the 2014 [DOJ] letters was an expert report made in connection with the action.

At the disciplinary hearing, Cassilly provided several reasons as to why he did not

- 18 -

turn over the 2014 DOJ letters: (1) the letters were irrelevant; (2) the letters were not impeachment evidence because he did not intend to call Agent Malone as a witness at the new trial; (3) the DOJ had indicated that the letters would be sent to defense counsel; and (4) the letters were not responsive to the discovery requests. The hearing judge rejected each of these reasons and found that the 2014 DOJ letters "constituted both exculpatory and impeachment evidence."

On September 9, 2016, Huffington's counsel wrote to Cassilly and requested any communications between the State and the DOJ and/or the Innocence Project relating to the case. On September 13, 2016, Cassilly responded: "You already have in your files the reports of all expert examinations conducted in connection with this case. Again all of the FBI reports are contained in the Sheriff's files." The 2014 DOJ letters were not included in the Sheriff's files.

On September 27, 2016, Huffington filed a motion to compel discovery. On September 28, 2016, with the Honorable Theresa M. Adams presiding, the circuit court conducted a pretrial conference. During the conference, Huffington's counsel stated that, on "October 21st, 1999, a senior attorney at the [DOJ] sent a letter to [] Cassilly informing him that FBI agent Michael Malone had testified falsely in [] Huffington's case." In response, Cassilly stated:

> No. They never said that. That has been a patent lie stated by the Defense every time this has come up. There is a written opinion from the [DOJ] saying that they reviewed Malone's testimony in this case and found nothing wrong. Malone subsequently, ten years after this case, was found ti [sic] -- testified falsely in other cases. But there is a written letter which the Defense has which stated that Malone's testimony in this case was within professional limit.

The hearing judge found that Cassilly's "statements to Judge Adams were knowingly and intentionally false" as "[t]he Robertson Report identified problems with Agent Malone's testimony, and the 2014 [DOJ] letters concluded that the testimony exceeded the limits of science."

On February 7, 2017, Huffington's counsel wrote to Cassilly requesting that Cassilly produce all Brady[14] material and "[a]ny correspondence with law enforcement that has not been disclosed regarding forensic testing." On February 15, 2017, Cassilly responded that he was not aware of any correspondence that had not already been furnished to the defense and stated that he had produced all discoverable information. The hearing judge found that, as of February 15, 2017, Cassilly had not produced the 2014 DOJ letters "despite the fact that the letters were exculpatory and constituted impeachment evidence."

On February 27, 2017, Huffington filed a "Motion to Compel Identification of All Lost or Destroyed Evidence." On March 7, 2017, the circuit court conducted a hearing on the motion. At the hearing, the circuit court asked Cassilly if he had any exculpatory evidence that had not been turned over. Cassilly responded that the FBI sent two letters concerning Agent Malone that ultimately concluded that Agent Malone had testified properly and did not do anything wrong in Huffington's case. The hearing judge found that Cassilly "knowingly and intentionally misrepresented to the [circuit c]ourt that the FBI

---

[14]Brady v. Maryland, 373 U.S. 83 (1963) "and its progeny guarantee to a criminal defendant who stands trial the right to receive material exculpatory and impeachment evidence in the possession of the State." Canales-Yanez v. State, 472 Md. 132, 158, 244 A.3d 1096, 1111 (2021) (cleaned up).

[had] concluded that they did not find Agent Malone did anything wrong in [] Huffington's case."

On November 9, 2017, Huffington entered Alford pleas[15] to two counts of first-degree murder, one count of armed robbery, and one count of burglary. The plea agreement provided that Huffington would receive two concurrent life sentences with all but time served (11,752 days) suspended. As part of the plea agreement, Huffington agreed to waive his appeal and postconviction rights and consented to the destruction of evidence in his case.

### Bar Counsel's Investigation

On November 13, 2018, Huffington filed with Bar Counsel a complaint against Cassilly. On November 29, 2018, Bar Counsel wrote to Cassilly and enclosed a copy of the complaint. On December 3, 2018, Cassilly responded that he did not withhold any exculpatory evidence in Huffington's case. On January 29, 2019, Bar Counsel requested that Cassilly address his failure to provide Huffington's counsel with materials received from the DOJ. Cassilly responded that "[a] review of the agent's testimony in this case

---

[15]An Alford plea, derived from North Carolina v. Alford, 400 U.S. 25 (1970),

> is a plea in which the individual retains the right to appellate review of evidence subject to a suppression motion but avoids going through the time and expense of a full trial. By pleading not guilty and agreeing to the proffer of stipulated evidence or an agreed statement of facts, an individual, like with a guilty plea, waives a jury trial and the right to confront witnesses but retains appellate review of the suppression decision.

Rogers v. State, 468 Md. 1, 44 n.7, 226 A.3d 261, 287 n.7 (2020), cert. denied, ___ U.S. ___, 141 S. Ct. 1052 (2021) (cleaned up).

- 21 -

found that he had not overstated his findings."

On September 11, 2019, Bar Counsel wrote to Cassilly to schedule a date to take a statement under oath and, on September 17, 2019, Bar Counsel issued a subpoena pursuant to Maryland Rule 19-712, ordering Cassilly to appear at the Office of Bar Counsel on October 1, 2019 to respond under oath to questions. Cassilly appeared on that date but refused to take the oath. At the disciplinary hearing, Cassilly acknowledged that he refused to take the oath, stating: "I said you are not asking me about stuff from 20 years ago and then criticizing me or trying to pull me up on some sort of perjury charge because I couldn't remember accurately what we were talking about from 20 years ago."

## Aggravating and Mitigating Factors

The hearing judge did not find any aggravating factors. The hearing judge found as mitigating factors that Cassilly has no prior attorney discipline and "that he generally enjoys a positive reputation in the legal community."

## STANDARD OF REVIEW

In an attorney discipline proceeding, this Court reviews for clear error a hearing judge's findings of fact and reviews without deference a hearing judge's conclusions of law. See Md. R. 19-740(b)(1) and (b)(2)(B); Attorney Grievance Comm'n v. Slate, 457 Md. 610, 626, 180 A.3d 134, 144 (2018). This Court determines whether clear and convincing evidence establishes that a lawyer violated a Rule of Professional Conduct. See Md. R. 19-727(c).

## DISCUSSION

## (A) Doctrine of Laches

Cassilly contends that there was an "inordinate delay" in Huffington's filing of the complaint and in Bar Counsel's filing of the Petition for Disciplinary or Remedial Action that "engendered a due process violation" and essentially argues that the doctrine of laches should bar the attorney discipline proceeding. Specifically, Cassilly asserts that Huffington waited seven-and-a-half years after learning of the Robertson Report before filing a complaint against him and that Bar Counsel waited another year-and-a-half before filing the Petition for Disciplinary or Remedial Action, which in his view constituted an inordinate delay. Cassilly argues that due to the delay both he and the Honorable Joseph F. Murphy, whom he called as an expert witness (Judge Murphy had also served as Kanaras's defense attorney at trial), had trouble recalling the circumstances surrounding receipt of the Robertson Report and could only testify at the disciplinary hearing "as to vague impressions[.]" According to Cassilly, this placed him at a "disadvantage in providing a response utilizing Judge Murphy's recollection of receiving the Robertson report." We are not persuaded by Cassilly's contentions and conclude that the doctrine of laches is inapplicable in this attorney discipline proceeding. We explain.

"The doctrine of laches, which is both an affirmative defense and an equitable defense, applies where there is an unreasonable delay in the assertion of one party's rights and that delay results in prejudice to the opposing party." <u>Jones v. State</u>, 445 Md. 324, 329, 126 A.3d 1162, 1165 (2015) (citation omitted). The purpose of laches is to protect "against stale claims[.]" <u>State Ctr., LLC v. Lexington Charles Ltd. P'ship</u>, 438 Md. 451,

585, 92 A.3d 400, 480 (2014) (cleaned up).  In applying the doctrine of laches, "generally, we must analyze whether, (1) in the context of an equitable claim, (2) there was an unreasonable delay in the filing and, if so, (3) whether there was any prejudice[,]" which "is generally held to be anything that places the defendant in a less favorable position."  Id. at 586, 92 A.3d at 481 (cleaned up).  Whether laches applies depends on an evaluation of the facts and circumstances of a particular case.  See id. at 590, 92 A.3d at 483. Importantly, "[t]he passage of time, alone, does not constitute laches but is simply one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made."  Id. at 590, 92 A.3d at 483 (cleaned up).

Our jurisprudence is replete with cases in which we have expressed doubt about the applicability of the doctrine of laches to attorney discipline proceedings and found the elements of the defense not to have been satisfied.  In Anne Arundel Cty. Bar Ass'n, Inc. v. Collins, 272 Md. 578, 581-82, 583, 585, 325 A.2d 724, 726, 727, 728-29 (1974), this Court rejected an attorney's contention that disciplinary proceedings against him were barred by laches and the general three-year statute of limitations for most civil claims.  The attorney was alleged to have bribed, in his position as attorney for the Board of License Commissioners, two members of the Board to influence their decisions concerning applications for alcoholic beverage licenses.  See id. at 579, 325 A.2d at 725.  The attorney contended that disciplinary proceedings against him were barred by the statute of limitations and laches because of the lapse of almost four years between his indictment and the filing of the grievance petition.  See id. at 581-82, 325 A.2d at 726-27.  We held that the general three-year statute of limitations "does not apply to disciplinary proceedings

brought against members of the Bar." Id. at 583, 325 A.2d at 727. We explained that courts in other jurisdictions had uniformly concluded as much "primarily because a disciplinary proceeding is neither an action at law, nor a criminal prosecution." Id. at 582, 325 A.2d at 727 (citations omitted). In an attorney discipline case,

> the inquiry is in the nature of an investigation by the court into the conduct of one of its own officers, and is not the trial of an action at law, as the order which is entered is only an exercise of the disciplinary jurisdiction which a court has over [i]ts officers.

Id. at 582-83, 325 A.2d at 727 (citation omitted).

We rejected the attorney's defense of laches—"assuming without deciding its applicability to disciplinary proceedings"—because the attorney had not produced any "evidence of disadvantage or prejudice which he claim[ed] to have suffered because of th[e] delay." Id. at 585, 325 A.2d at 728-29 (internal quotation marks omitted). In addition to failing to demonstrate disadvantage or prejudice, we noted that the attorney had "cited no cases in which disciplinary proceedings against an attorney ha[d] been dismissed upon the ground of laches." Id. at 583, 325 A.2d at 728. We quoted with approval the Supreme Court of Oregon's discussion concerning laches in In Re Weinstein, 459 P.2d 548, 549 (Or. 1969), cert. denied, 398 U.S. 903 (1970), a case in which that Court "held that a bar association delay of twenty-seven months did not justify dismissal":

> It is unnecessary to define in this case the proper remedy for vexatious and unreasonable delay on the part of the Bar. None has been shown in this case. It ought to be made clear, however, that the primary purpose of professional disciplinary proceedings is to protect the public. The punishment of an offending member of the profession is indeed a serious matter, but it is incidental to the protection of the public. If the conduct of a member of the Bar disqualifies him from the practice of law, it would not be in the public

- 25 -

interest to dismiss the disciplinary proceedings for no reason other than the Bar's failure to prosecute them with the proper dispatch.

Collins, 272 Md. at 584, 325 A.2d at 728 (emphasis omitted).

Less than a year after Collins, in Bar Ass'n of Baltimore City v. Posner, 275 Md. 250, 255, 339 A.2d 657, 660 (1975), we concluded that an attorney's "attempt to raise limitations or laches as a defense overlook[ed] the proceeding's purpose, that of protecting the public." (Citations omitted). We stated that the purpose of a disciplinary proceeding is "to protect the public by determining a lawyer's fitness to practice law" and that the attorney "was entitled to [] a full and fair hearing, which he had." Id. at 255, 339 A.2d at 660 (citations omitted).

In Attorney Grievance Comm'n v. Engerman, 289 Md. 330, 346, 424 A.2d 362, 370 (1981) (per curiam), although an attorney correctly asserted "that former Bar Counsel had knowledge of all the essential facts alleged in" two parts of the petition for disciplinary action but failed to advise the attorney of the allegations contained in one part of the petition until approximately two-and-a-half years later, we concluded that the doctrine of laches was not a defense that the attorney could successfully invoke and did not apply in the attorney discipline proceeding. We explained that we had "clearly stated" our view on the matter in Collins and we again favorably quoted the Supreme Court of Oregon's opinion in Weinstein, 459 P.2d at 549. Engerman, 289 Md. at 346, 424 A.2d at 370. Citing Posner, 275 Md. at 255, 339 A.2d at 660, we concluded: "Since the purpose of this proceeding[] is solely to protect the public by determining a lawyer's fitness to practice law, the [attorney] is entitled only to a full and fair hearing, not anything more." Engerman, 289 Md. at 346,

424 A.2d at 370. We determined that, in any event, the attorney had failed to demonstrate any prejudice from any delay in the commencement of disciplinary proceedings. See id. at 346, 424 A.2d at 370. Accordingly, we upheld the hearing judge's determination that the doctrine of laches did not apply. See id. at 347-48, 424 A.2d at 371.

In Attorney Grievance Comm'n v. Kahn, 290 Md. 654, 684, 431 A.2d 1336, 1352 (1981), we similarly rejected an attorney's defense of laches due to the lack of prejudice to the attorney caused by the delay in the filing of a petition for disciplinary action. The attorney moved to dismiss the attorney grievance proceeding on the ground that Bar Counsel was barred by laches from proceeding because Bar Counsel was notified that the Review Board of the Attorney Grievance Commission had directed that charges be filed against the attorney nearly two years before Bar Counsel actually filed the petition. See id. at 677, 431 A.2d at 1348. According to the attorney, the nearly two-year delay was unreasonable and unjustifiable and resulted in prejudice to him. See id. at 677, 431 A.2d at 1348. The hearing judge denied the motion to dismiss, assuming without deciding that laches applied to attorney discipline proceedings and determining that there was "no substantial evidence" that the attorney had "been prejudiced by the delay in prosecuting the [] charges." Id. at 677-78, 431 A.2d at 1349. Before us, the attorney contended that the hearing judge erred in determining that the defense of laches was inapplicable. See id. at 678, 431 A.2d at 1349. We rejected the attorney's contention, explaining:

> While the delay in [the attorney]'s case was gross and inexcusable—a fact readily acknowledged by newly appointed Bar Counsel during oral argument on the exceptions—we agree with [the hearing judge] that the evidence does not show that [the attorney] was prejudiced by the delay. Because the purpose of disciplinary action against an attorney is to protect the public,

- 27 -

dismissal of the disciplinary petition for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted.

Id. at 684, 431 A.2d at 1352 (citations omitted).

In Attorney Grievance Comm'n v. Owrutsky, 322 Md. 334, 339-40, 587 A.2d 511, 513-14 (1991), we rejected an attorney's contention that the disciplinary proceeding be dismissed on the ground of laches. The attorney represented a husband and wife in various business and personal matters, including preparing a will for the husband in August 1975, which identified the husband's daughter and the attorney as co-personal representatives, and supervising the execution by the wife of a codicil to her will. See id. at 336-37, 587 A.2d at 512. In April 1984, approximately eight years after the husband died and approximately seven years after the wife died, the daughter filed a complaint against the attorney with the Attorney Grievance Commission. See id. at 337-38, 587 A.2d at 512-13. The Office of Bar Counsel conducted an investigation and proceedings occurred before the Inquiry Panel and the Review Board of the Attorney Grievance Commission. See id. at 338, 587 A.2d at 513. In December 1988, Bar Counsel filed the petition in this Court and we referred the matter to a hearing judge. See id. at 338, 587 A.2d at 513. Before the hearing judge, the attorney moved to dismiss the petition, contending that he had been prejudiced by an inordinate delay in the filing of charges against him. See id. at 338-39, 587 A.2d at 513.

In considering the attorney's motion to dismiss on the ground of laches, we noted that we had rejected a similar contention in Collins and quoted approvingly from the Supreme Court of Oregon's statement in Weinstein in that case. See Owrutsky, 322 Md.

at 339, 587 A.2d at 513. We reiterated that, "because the purpose of disciplinary action against an attorney is to protect the public, dismissal of the disciplinary petition for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted." Id. at 340, 587 A.2d at 513 (quoting Kahn, 290 Md. at 684, 431 A.2d at 1352) (cleaned up). We observed that the attorney contended that he was prejudiced because his bookkeeper, who handled many of the transactions in connection with the husband's and wife's estates, had died. See Owrutsky, 322 Md. at 340, 587 A.2d at 514. We rejected the attorney's contention and instead agreed with the hearing judge that the attorney had not been prejudiced by the delay in filing charges. See id. at 340, 587 A.2d at 514. We explained that Bar Counsel had pointed out that the bookkeeper had previously given recorded testimony before the Inquiry Panel, while under oath and subject to cross-examination, and that the bookkeeper's testimony would be admissible under the "prior testimony" exception to the rule against hearsay. See id. at 340, 587 A.2d at 514. As such, we denied the attorney's motion to dismiss. See id. at 340, 587 A.2d at 514.

In Attorney Grievance Comm'n v. Goldsborough, 330 Md. 342, 356-58, 348, 624 A.2d 503, 509-10, 505 (1993), we rejected an attorney's attempt to raise the defense of laches in an attorney discipline proceeding involving incidents of sexual assault and harassment. In 1989, a woman, who had been a client, alleged incidents in the late 1970s and filed a complaint against the attorney with the Attorney Grievance Commission. See id. at 357 n.5, 347-48, 624 A.2d at 510 n.5, 505. During the investigation of the complaint, the Commission's investigators learned of allegations that the attorney had sexually assaulted and harassed two other women, one who had been his client in 1984 and one who

had been his administrative assistant from 1986 to 1987.  See id. at 348-49, 624 A.2d at 505-06.

In considering the attorney's laches argument, we stated that we had "previously expressed doubt about the applicability of the laches defense in attorney grievance proceedings" and that "[t]his doubt springs from our concern for the underlying purpose of the Attorney Grievance process."  Id. at 356, 624 A.2d at 510 (citing Engerman, 289 Md. at 346, 424 A.2d at 370; Collins, 272 Md. at 583, 325 A.2d at 728).  We noted that the issue in Engerman and Collins "was the disciplinary authorities' delay in pursuing action against an attorney once a complaint was brought, rather than a complainant's delay in bringing the complaint[,]" but explained:

> Nonetheless, the Court's prior comments are especially applicable to this case.  While we encourage and expect members of the public to promptly pursue attorney grievance actions when they are warranted, the mere failure of a complainant to promptly file a complaint should not necessarily foreclose disciplinary action against the attorney.  In this case, to the extent that the investigation sparked by the complaint revealed a pattern of conduct stretching from [one client]'s experience in the late 1970s to [the attorney's administrative assistant]'s as late as 1987, we believe it was appropriate to pursue both an investigation and the filing of disciplinary charges.

Goldsborough, 330 Md. at 357, 624 A.2d at 510 (footnote omitted).  In addition, we were unpersuaded by the attorney's reliance on a case in which this Court had "adopted the Attorney Grievance Commission's recommendation of a reprimand over suspension or disbarment because 'much water had gone over the dam' since the violations complained of had occurred."  Id. at 357-58, 624 A.2d at 510 (cleaned up).  We explained that reliance on the case was misplaced, as it "addressed the passage of time only as a mitigating circumstance affecting the Court's sanction" and "did not suggest that the passage of time

- 30 -

should in any way affect whether the violation itself should be found[.]" Id. at 358, 624 A.2d at 510.

In Attorney Grievance Comm'n v. Braskey, 378 Md. 425, 441-43, 836 A.2d 605, 615-16 (2003), we denied an attorney's motion to dismiss a disciplinary proceeding, explaining:

> There is no statute of limitations in an attorney disciplinary proceeding and mere delay does not warrant dismissal. We have often noted that the purpose of attorney discipline proceedings is to protect the public by determining a lawyer's fitness to practice law, and that an attorney is entitled only to notice of the charges, and a full and fair hearing, not anything more.
> A mere delay in disciplinary proceedings is not a basis for dismissal, absent a showing of prejudice. . . . Even in a case where we found the delay gross and inexcusable, we noted that the attorney was not prejudiced by the delay and that dismissal for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted.
> The Court of Appeals for the District of Columbia stated that "an undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct." [*Matter of*] *Williams*, 513 A.2d 793, 796 (D.C.[ ]1986). . . . This is a view shared by other courts in addressing delay in attorney disciplinary proceedings.

(Cleaned up). We stated, though, that delay is not irrelevant, because "[i]f an attorney's ability to present a defense is substantially impaired, and an attorney can show actual prejudice to the defense, there might be a due process violation." Braskey, 378 Md. at 444, 836 A.2d at 617 (citations omitted). We concluded, however, that the attorney had not demonstrated such prejudice. Id. at 444, 836 A.2d at 617.

More recently, in Attorney Grievance Comm'n v. Penn, 431 Md. 320, 334, 336, 323, 65 A.3d 125, 134-35, 127 (2013), we overruled an attorney's exception that his defense was adversely impacted by a delay in the disciplinary proceedings, during which

time the attorney's former employer destroyed various files, and that as a result the case should be dismissed. We explained that "prejudice is the gravamen for any dismissal motion to be favorably entertained by this Court in any attorney grievance action; a claim of delay must be accompanied by a showing of prejudice." Id. at 335, 65 A.3d at 134. We ultimately agreed with the hearing judge that the files at issue would not have negated the attorney's misconduct, explaining that the attorney "testified at the hearing in accordance with his proffer before us about what the documents would have proven. [The hearing judge] heard [the attorney]'s testimony and did not find it to be compelling to negate his misconduct, so that the absence of the documents could not be prejudicial." Id. at 336, 65 A.3d at 135.

As is readily apparent, we have on numerous occasions over almost the past five decades "expressed doubt about the applicability of the laches defense in attorney grievance proceedings" given the underlying purpose of attorney discipline proceedings, Goldsborough, 330 Md. at 356, 624 A.2d at 510 (citations omitted), which "is to protect the public[,]" Engerman, 289 Md. at 346, 424 A.2d at 370 (citation omitted). We continue to express strong reservation as to the applicability of the doctrine of laches in attorney discipline proceedings and now conclude that, with the possible exception of cases involving both extraordinary circumstances of delay and actual prejudice resulting in a clear due process violation, applying the doctrine of laches to attorney discipline proceedings would not be consistent with the goal of such proceedings, which is to protect the public. In this case, we determine that the record fails to demonstrate the existence of the type of unreasonable delay and prejudice generally prohibited by the doctrine of laches,

let alone the type of extraordinary delay and prejudice that would be necessary to affect the ability of an attorney disciplinary case to proceed.

Here, there was no unreasonable delay on Bar Counsel's part in filing the Petition for Disciplinary or Remedial Action against Cassilly. On November 13, 2018, Huffington filed a complaint against Cassilly with Bar Counsel, and less than two years later, on September 8, 2020, Bar Counsel filed the petition in this Court. During the intervening time, as the hearing judge found, Bar Counsel conducted an investigation of the complaint. Bar Counsel's investigation included requesting responses from Cassilly to the complaint, interviewing witnesses, obtaining and reviewing documents, seeking to take Cassilly's statement under oath, presenting the case to the Attorney Grievance Commission, and preparing the Petition for Disciplinary and Remedial Action. At the disciplinary hearing, Bar Counsel called six witnesses, including an expert witness, and introduced over fifty exhibits into evidence. In our view, under the circumstances of the case, the approximately twenty-two-month period between the filing of the complaint by Huffington and the filing of the petition with this Court by Bar Counsel did not constitute an unreasonable delay.

To be sure, as Cassilly points out, Huffington learned of the Robertson Report, when his counsel received a copy of the report from a reporter in November 2011, and did not file a complaint with Bar Counsel until seven years later in November 2018. Certainly, any delay on Huffington's part in filing a complaint cannot be attributed to Bar Counsel for the purpose of laches and Huffington's delay in filing the complaint would not serve to preclude Bar Counsel from pursuing the matter. Huffington filed the complaint only one year after entering Alford pleas, being sentenced to time served, and concluding his

criminal case. In other words, Huffington acted promptly in filing the complaint once he was no longer in jeopardy of a criminal conviction. In any event, what we stated in Goldsborough, 330 Md. at 357, 624 A.2d at 510, would apply with equal force here: "While we encourage and expect members of the public to promptly pursue attorney grievance actions when they are warranted, the mere failure of a complainant to promptly file a complaint should not necessarily foreclose disciplinary action against the attorney." In this case, just as in Goldsborough, id. at 357, 624 A.2d at 510, although Huffington, the complainant, filed a complaint years after the basis for the complaint became known to him, it was appropriate for Bar Counsel to pursue both an investigation and the filing of disciplinary charges.

In addition, even if there had been unreasonable or extraordinary delay in Bar Counsel's bringing the petition, Cassilly would not prevail based on the defense of laches because he has not demonstrated that he was prejudiced by the delay. See Braskey, 378 Md. at 444, 836 A.2d at 617. In his exceptions, the only form of prejudice alleged by Cassilly is faulty memory on his and Judge Murphy's part concerning "the particulars of having received the Robertson [R]eport." Without more, this bare allegation does not come close to demonstrating actual prejudice caused by any delay in the filing of the complaint or the petition.[16] In addition, the faulty memory that Cassilly alleges could just as easily

_____

[16]The allegation that Cassilly was somehow prejudiced by Judge Murphy being unable to fully recollect his receipt of the Robertson Report is unpersuasive. Judge Murphy was called by Cassilly at the disciplinary hearing and was accepted as an expert witness in the areas of "criminal law and duty to disclose." As an expert witness, Judge Murphy would have reviewed documents or information related to the case and been permitted to

- 34 -

be attributed to the existence of the twelve-year delay between the time that Cassilly received the Robertson Report from Thompson in October 1999 and the point at which Huffington's counsel finally received a copy of the report in November 2011 from a reporter, *i.e.*, the period of time during which Cassilly himself failed to disclose the report. In short, we conclude that Cassilly has not demonstrated prejudice and the defense of laches—even if the doctrine were generally applicable to Attorney Grievance Commission cases—is not satisfied here.

Moreover, the mitigating factor of a delay in the attorney discipline proceeding exists to address the circumstances for which Cassilly attempts to invoke laches. See Slate, 457 Md. at 647, 180 A.3d at 156. In Goldsborough, 330 Md. at 358, 624 A.2d at 510, we

---

render an opinion within the scope of his expertise. For example, on direct examination, Cassilly's counsel asked Judge Murphy: "As a result of the work that you did in this case and your understanding, do you have an opinion to a reasonable degree of professional certainty whether [] Cassilly had a duty to disclose the information that came out subsequent to conviction about . . . Agent Malone?" The circumstance that Judge Murphy represented Kanaras and may have at some point independently received the Robertson Report and may or may not have recalled the circumstances of his receiving the report had no bearing on Judge Murphy's testimony as an expert witness nor any relevance as to the issue of whether Cassilly was under a duty to disclose the report. Indeed, in response to Cassilly's counsel's question about the basis of Judge Murphy's opinion that Cassilly had no such duty, Judge Murphy testified in part:

> The letter caught up with me somehow and at that time obviously I wasn't representing [] Kanaras anymore and I can't remember whether [] Kanaras had actually been released from Division of Corrections, but if he was still in the Division of Corrections he was represented by Bill Gately or Larry Nathans. I guess my practice would have been to turn the letter over to them.
>     But the information in the letter was really of no consequence to [] Kanaras'[s] case because it was [Agent] Malone's testimony when he testified at Kanaras'[s] trial as well as at [] Huffington's trial, [Agent] Malone's testimony was consistent with [] Kanaras'[s] testimony.

stated that the passage of time between the misconduct at issue and institution of charges against an attorney may serve "as a mitigating circumstance affecting the Court's sanction[,]" but does not "in any way affect whether the violation itself should be found[.]" In this case, the hearing judge did not find the mitigating factor of a delay in the attorney discipline proceeding and, tellingly, Cassilly has not raised an exception to the lack of such a finding.

**(B) Findings of Fact**

Bar Counsel does not except to any of the hearing judge's findings of fact.

Cassilly raises numerous exceptions but does not categorize any of the exceptions as being either to the hearing judge's findings of fact or conclusions of law. The exceptions that Cassilly raises appear to concern, in part, both the hearing judge's findings of fact and conclusions of law. For example, Cassilly excepts to the hearing judge's determinations: (1) that the Robertson Report and 2014 DOJ letters were exculpatory; (2) that the 2014 DOJ letters were required to be disclosed (Cassilly contends that the letters were in fact disclosed); (3) that the Robertson Report tended to negate Huffington's guilt (Cassilly contends that the hearing judge "exaggerated the importance of [Agent] Malone to the State's case" and that the criticisms of Malone's testimony were not material); and (4) that "he deliberately misstated and attempted to mislead" the circuit court when he made statements to the court about the Robertson Report. Cassilly's exceptions will be addressed below in our discussion of the conclusions of law, given that his exceptions to findings of fact and conclusions of law are intertwined.

## (C) Conclusions of Law

The hearing judge concluded that Cassilly violated Rules 3.3(a)(1), 3.4(a), 3.8(d), 8.4(c), 8.4(d), and 8.4(a), but did not violate Rule 8.1(b). Cassilly generically contends that his actions did not violate any of the Rules and "were not unethical." Bar Counsel excepts to the hearing judge's conclusion that Cassilly did not violate Rule 8.1(b). We overrule Cassilly's exceptions, sustain Bar Counsel's exception, and conclude that clear and convincing evidence demonstrates that Cassilly violated Rules 3.3(a)(1), 3.4(a), 3.8(d), 8.1(b), 8.4(c), 8.4(d), and 8.4(a).

### Rule 3.3(a)(1) (Candor Toward the Tribunal)

The hearing judge concluded that Cassilly "violated Rule 3.3(a)(1) by knowingly making false statements of fact to the court regarding the information contained in [] Thompson's 1999 letter and the Robertson Report." The hearing judge found that Cassilly made false statements on four separate occasions. First, the hearing judge found that Cassilly made a false statement on January 14, 2011, in the State's response to the petition for a writ of actual innocence by stating (in writing) that "no evidence has been presented that the conclusion that examiner Malone rendered in court is not correct." Second, the hearing judge found that Cassilly made a false statement on March 30, 2011 when, at a hearing in connection with the petition for a writ of actual innocence, Cassilly stated that "there's no evidence today that anything that [Agent Malone] said in this trial or that subsequent comparison of the hairs that he made in this trial have been shown to be incorrect." Next, the hearing judge found that Cassilly made a false statement on September 28, 2016, during the pretrial conference before Judge Adams, when he stated

that "[t]here is a written opinion from the DOJ saying that they reviewed Malone's testimony in this case and found nothing wrong." Finally, the hearing judge found that Cassilly made a false statement on March 7, 2017, when he advised Judge Adams that the FBI had concluded that Agent Malone "testified properly[.]" The hearing judge concluded that all four of the representations by Cassilly were knowingly and intentionally false.

Although he does not specifically mention Rule 3.3(a)(1), Cassilly "takes exception to the finding that he deliberately misstated and attempted to mislead the [circuit c]ourt[] with respect to the contents of the [] Robertson [R]eport." Cassilly contends that, when speaking at the first hearing, he was "recalling the gist of [a] report he had not seen for 11 years and of which he did not have a copy." Cassilly argues that "his characterization of the report is a fair interpretation of a confusing, check-the-box unexplained document." Cassilly asserts that Judge Murphy's testimony about the Robertson Report was consistent with how he characterized the report in statements to the circuit court, which demonstrates that his statements about the Robertson Report were "fair[.]" Cassilly points out that Judge Adams testified that he is a person of integrity, and he contends that he had no motive to mislead the circuit court about the Robertson Report. We overrule the exception.

Rule 3.3(a)(1) provides that "[a]n attorney shall not knowingly[] make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the attorney[.]" (Paragraph break omitted). The duty of candor "stems from the proposition that every court has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it." Attorney Grievance Comm'n v. Hoerauf, 469 Md. 179, 211, 229 A.3d 802, 821 (2020) (cleaned up). As such,

Rule 3.3(a)(1) "requires that an attorney be candid at all times with a tribunal" and an attorney violates Rule 3.3(a)(1) "when he or she knowingly provides a court with false information." Id. at 211, 229 A.3d at 821 (cleaned up). Moreover, "[a]n attorney does not need a selfish motive to violate [] Rule []3.3(a)(1)." Attorney Grievance Comm'n v. Keating, 471 Md. 614, 649, 243 A.3d 520, 541 (2020). Similarly, in Attorney Grievance Comm'n v. Steinhorn, 462 Md. 184, 197, 198 A.3d 821, 828 (2018), we stated that a hearing judge's findings of fact that an attorney did not intend to deceive the court and did not harm anyone in submitting false information to the court—"findings that Bar Counsel [did] not except[] to and [that] we thus adopt[ed]"—were "immaterial" to the analysis of whether the attorney had violated Rule 3.3(a)(1). Rather, "[w]hat matters for purposes of finding a[ Rule] 3.3(a)(1) violation is whether an attorney knows that the information he or she presents to the tribunal is incorrect." Id. at 197, 198 A.3d at 828 (citation omitted).

In Attorney Grievance Comm'n v. Litman, 440 Md. 205, 217, 101 A.3d 1050, 1057 (2014), we concluded that, among other misconduct, an attorney violated Rule 3.3(a) when the attorney "misrepresented intentionally facts and the law to both judicial and administrative tribunals[.]" We explained that, even if the attorney's misconduct during his representation of his client "was an aberration in an otherwise competent and ethical legal career to that point," as the attorney had claimed, the attorney nonetheless "engaged in the same course of conduct twice in his representation of [the client]: once before the federal court and again before the Pennsylvania Environmental Hearing Board." Id. at 217, 101 A.3d at 1057-58. Moreover, even after being informed by the Pennsylvania Department of Environmental Protection of the lack of basis for "the so-called factual

- 39 -

statements and legal arguments upon which he relied," the attorney "took no measures to remedy the situation" and instead "either made deliberately the misrepresentations at issue or blinded himself willfully to the falsity of his contentions." Id. at 217, 101 A.3d at 1058.

In this case, the hearing judge's findings with respect to the falsity of the statements at issue are amply supported by the record, *i.e*., are not clearly erroneous, and clear and convincing evidence supports the conclusion that Cassilly violated Rule 3.3(a)(1). Cassilly made the first knowingly false statement when, on January 14, 2011, in the State's response to the petition for a writ of actual innocence, he stated in writing that "[n]o evidence has been presented that the conclusion that examiner Malone rendered in court is not correct." Next, on March 30, 2011, at a hearing in connection with the petition for a writ of actual innocence, Cassilly made a similar knowingly false statement when he advised the circuit court that "there's no evidence today that anything that [Agent Malone] said in this trial or that subsequent comparison of the hairs that he made in this trial have been shown to be incorrect." It is undisputed that, as the hearing judge found, Cassilly had received the Robertson Report at the time he responded to the petition for a writ of actual innocence, and the report "identified multiple issues with Agent Malone's analysis." Cassilly's contention is not that he was unaware of the Robertson Report at the time that he made the statements but rather that he was unable to fully recall the content of the report and that his characterization of the report was not misleading.

The record demonstrates otherwise. In a letter dated October 21, 1999, Thompson wrote to Cassilly concerning the results of the independent scientific review in Huffington's case and enclosed a copy of the Robertson Report. In addition to enclosing

the Robertson Report, in the letter, Thompson summarized the OIG's findings concerning Agent Malone's testimony in the Hastings case, including the conclusion that Agent Malone's testimony was incorrect and misleading, that he had testified falsely regarding the tensile test, and that he had been criticized for testifying outside of his expertise and inaccurately concerning test results in the case.

The Robertson Report directly pertained to Huffington's case. In the report, Robertson indicated, by checking boxes in response to questions pertaining to Huffington's case, that he was unable to determine whether Agent Malone had performed the appropriate tests in a scientifically acceptable manner and that Agent Malone's examination results as set forth in the laboratory report were not supported or adequately documented in the bench notes. Robertson indicated that, although Agent Malone's testimony was consistent with the laboratory report, his testimony was not consistent with bench notes. Significantly, in the comments section of the report, Robertson unequivocally and plainly wrote: "There is insufficient documentation to determine if the hair comparison was performed in a scientifically acceptable manner." Similarly, Robertson stated in no uncertain terms:

> The results are not adequately documented in the notes. The notes are not dated, are in pencil and have some erasures. Some hair were deemed unsuitable with no documented reason or explanation. The examiner uses abbreviations that are difficult to interpret. Some questioned hair were matched or eliminated as coming from the known samples without characterization of the microscopic characteristics observed in these questioned or known hair. The technicians do not document the recovery of any hair from the questioned items.

Robertson also explicitly stated that, "[i]n the 1982 transcript, the examiner testifies 'I processed', 'I found', 'I examined', 'I removed' when it[']s more likely the technicians

- 41 -

processed and removed the questioned hair from the items."

In addition to having received the Robertson Report and Thompson's October 21, 1999 letter, at the time that Cassilly responded to the petition for a writ of actual innocence and attended the hearing on the petition, he had already received Thompson's June 18, 1997, letter enclosing a copy of the 1997 Report (issued by the OIG), the Tobin memorandum, an article from *The Wall Street Journal* dated April 16, 1997, a letter from Huffington's attorney, Stewart, to the DOJ dated April 24, 1997, and Thompson's June 18, 1997 reply to Stewart. And, Cassilly had spoken with Jabloner (an attorney in the Criminal Division of the DOJ) concerning potential next steps to be taken about the forensic evidence in Huffington's case. After their discussion, Jabloner wrote a memorandum to her file, stating among other things that Cassilly "decided to wait a while to see if the defense files any post-conviction motions in the case" and that "[h]e had originally requested that an FBI laboratory examiner retest the evidence, but reconsidered and decided to wait to see what the defense will do[.]"

Put simply, when Cassilly wrote, in response to the petition for a writ of actual innocence, that there was no evidence that "the conclusion that examiner Malone rendered in court is not correct[,]" and advised the circuit court at a hearing in connection with the petition that there was no evidence that anything Agent Malone testified about at trial had been "shown to be incorrect," he was not telling the truth. Cassilly knew that he had received the Robertson Report (as well as Thompson's 1999 letter), which contained information that in no uncertain terms undermined the validity of Agent Malone's testimony and the accuracy of his conclusions in Huffington's case, and, in addition,

provided information that Agent Malone's testimony had been incorrect and misleading in the Hastings case. Cassilly also knew that he had received the 1997 Report and the Tobin memorandum and conferred with Jabloner about the possibility of having the hair samples retested, and decided to wait to see if the defense filed postconviction motions. Yet, after the defense filed a petition for a writ of actual innocence, on two separate occasions, Cassilly advised the circuit court that there was no evidence that the conclusion that Agent Malone provided in court was not correct. The hearing judge's finding that Cassilly knew these statements to be false is well supported by the evidence. The Robertson Report alone constituted evidence that Agent Malone's hair comparison and accompanying testimony may not have been correct.

To be sure, when responding to the petition for a writ of actual innocence and at the hearing on the petition, as Cassilly contends, he was making statements to the circuit court about a document (the Robertson Report) that he had received over a decade earlier and had purportedly discarded. An attorney's duty of candor and obligation to not knowingly make a false statement of fact to a tribunal, however, is not diminished or lessened as a result of the passage of time or because the attorney no longer retains possession of a key document. We are unpersuaded by Cassilly's contention that he did not knowingly make a false statement because he was simply "recalling the gist of" the Robertson Report when he indicated that there was no evidence that Agent Malone's testimony had been incorrect. In other words, we are unpersuaded that Cassilly made false statements to the circuit court because he could not remember the content of the Robertson Report or because the report was confusing. Tellingly, in responding to the petition for a writ of actual innocence and

at the March 30, 2011 hearing, Cassilly never advised the circuit court or Huffington's counsel of the Robertson Report or that he had received any document like it and that he was attempting to recall the gist of it. Rather than advising the circuit court that he had received a report questioning Agent Malone's testimony in the case and he could not recall or was unsure if it contained information indicating that Agent Malone's conclusion was incorrect and that he had not retained the document, if that was the case, Cassilly instead affirmatively falsely stated that there was no such evidence.

Next, as the hearing judge determined, Cassilly made another knowingly false statement on September 28, 2016, during the pretrial conference before Judge Adams, when he stated that the DOJ had reviewed Agent Malone's testimony and in a written report found "nothing wrong." Likewise, Cassilly made a knowingly false statement on March 7, 2017, when he advised Judge Adams that the FBI had concluded that Agent Malone "testified properly[.]" The record demonstrates that, by the time that Cassilly made these statements, not only had he previously received the Robertson Report and Thompson's 1999 letter (both of which challenged the accuracy of Agent Malone's testimony) as well as Thompson's 1997 letter, the 1997 Report, and the Tobin memorandum, but in addition, Cassilly had received Wong's 2014 DOJ letters, in which Wong specifically identified numerous errors in Agent Malone's testimony in Huffington's case and concluded that his testimony exceeded the bounds of science.

Plainly, Cassilly knowingly made false statements of fact at the pretrial conference of September 28, 2016 when he stated that the DOJ had issued a written opinion "saying that they reviewed Malone's testimony in this case and found nothing wrong[,]" and on

March 7, 2017, when he told Judge Adams that the FBI had concluded that Agent Malone "testified properly[.]" The Robertson Report, Thompson's 1999 letter, and 2014 DOJ letters are documents that Cassilly had received and that blatantly contradict his assertions to the circuit court. The Robertson Report plainly identified problems with Agent Malone's testimony and the 2014 DOJ letters went even further in identifying errors in Agent Malone's testimony and hair comparison and concluded that his testimony exceeded the limits of science in numerous ways.

We are not persuaded by Cassilly's contention that his statements to the circuit court about the Robertson Report constituted "a fair interpretation of a confusing, check-the-box unexplained document." A review of the Robertson Report leads to only one interpretation—that the accuracy of Agent Malone's testimony and hair comparison analysis in Huffington's case were directly called into question. Even if the questions and checked boxes on one page of the report could be described as ambiguous—which they are not—in the comments section of the report, Robertson straightforwardly stated, among other things, that there was "insufficient documentation to determine if the hair comparison was performed in a scientifically acceptable manner[,]" and "[s]ome questioned hair were matched or eliminated as coming from the known samples without characterization of the microscopic characteristics observed in these questioned or known hair." Certainly, as Judge Murphy testified, the Robertson Report did not explicitly state that Agent Malone's testimony was incorrect, but there is simply no way in which Cassilly or anyone else reviewing the Robertson Report could interpret the report as providing no evidence that Agent Malone testified incorrectly. In addition, Cassilly's contention that the Robertson

Report was "check-the-box" and was ambiguous or "confusing" is not consistent with his other assertion that, in making statements at issue to the circuit court, he was merely attempting to "recall[] the gist of" a document that he had received many years ago. On one hand, Cassilly argues that the report contained checked boxes providing ambiguous information that did not indicate that Agent Malone's testimony was incorrect, and, on the other hand, he asserts that he could not recall the content of the report.

Nor are we persuaded that Judge Murphy's testimony concerning the Robertson Report is somehow dispositive of whether Cassilly knowingly made false statements of fact or compels a conclusion that Cassilly did not violate Rule 3.3(a)(1). At the disciplinary hearing, Judge Murphy, who was accepted as an expert witness in the areas of criminal law and duty to disclose, opined that Cassilly was not obligated to disclose information that came out about Agent Malone after Huffington was convicted. With respect to the Robertson Report, Judge Murphy testified:

> It isn't a situation in which they said [Agent] Malone admitted lying. The person who looked over [Agent] Malone's work certainly criticized the way [Agent] Malone took notes. But my recollection of the document is that the person didn't say he is wrong or the science is junk or anything like that. . . . [T]he document that I reviewed said essentially [Agent] Malone's testimony was consistent with the lab analysis. The testing that was done, that it was not properly documented. He wrote it in pencil, he didn't date it, he made some erasures. It is not a situation in which Robertson, if he is the guy that wrote it, said he got it wrong. The way I read it, and I really can't tell much here, but what he testified to was consistent with the lab tests, but he certainly did a sloppy job documenting his work. . . . This is a review of an expert witness's testimony and it again is not one of these situations where the information is the witness lied. The witness had no clue about what he was doing. The information supplied by the witness is incorrect. . . . Robertson himself as I recall didn't say I don't know whether he got it right or he got it wrong. All he said was his testimony appears to be consistent with the lab tests, but he didn't document it as well as he should have.

Contrary to Cassilly's contention that Judge Murphy's testimony about the Robertson Report is "almost word-for[-]word how [he] characterized the Robertson [R]eport in statements to the court[,]" Cassilly affirmatively represented to the circuit court that there was no evidence at all that Agent Malone rendered an incorrect conclusion and that the DOJ had reviewed Agent Malone's testimony in the case and found nothing wrong. Judge Murphy did not testify as such. Judge Murphy's testimony was essentially that the report (the Robertson Report) did not indicate that Agent Malone had admitted lying but rather indicated that Agent Malone's testimony was consistent with the lab analysis/tests and that he did not document the lab tests as well as he should have in bench notes. Judge Murphy testified that the report did not explicitly state that Agent Malone got it wrong. Based on his interpretation of the report, Judge Murphy opined that Cassilly was not required to disclose the Robertson Report. Significantly, Judge Murphy was not asked to render an opinion as to whether Cassilly knowingly made false statements to the circuit court in advising the court that there was no information indicating that Agent Malone's testimony was not correct and in stating that the DOJ had advised that Agent Malone testified properly.

In addition, the transcript of Judge Murphy's testimony reveals that when he was asked whether he recalled reading the portion of the Robertson Report in which Robertson explicitly concluded that he was unable to determine whether Agent Malone performed the appropriate tests and in a scientifically appropriate manner and that Agent Malone's testimony was inconsistent with the bench notes, Judge Murphy responded: "I really don't.

I recall reading Robertson's letter." Judge Murphy was not asked whether those particular conclusions of Robertson were inconsistent with the statements that Cassilly made to the circuit court about the report. Cassilly's statements to the circuit court about the Robertson Report do not mirror Judge Murphy's testimony at the disciplinary hearing, and Judge Murphy was not asked to render an opinion as to whether Cassilly's statements violated Rule 3.3(a)(1). The Robertson Report and the 2014 DOJ letters speak for themselves and, along with other evidence, demonstrate that Cassilly knowingly made false statements of fact to the circuit court on four occasions.

Nor are we persuaded that Judge Adams's testimony compels the conclusion that Cassilly did not violate Rule 3.3(a)(1). On cross-examination, Deputy Bar Counsel asked Judge Adams whether she was aware that Cassilly was in possession of one of the 2014 DOJ letters when he represented to the circuit court that Agent Malone's testimony was within professional limits. Judge Adams responded: "I don't know that I was aware at the time. [] Cassilly's representation to the Court was that he had received a report years before that. His representation to the Court was that did not invalidate the agent's testimony." The record in this case demonstrates, though, that Cassilly did not simply represent or advise the circuit court (Judge Adams) that he had received a report that did not invalidate Agent Malone's testimony. Rather, at the pretrial conference in 2016, Cassilly falsely stated that the DOJ had reviewed Agent Malone's testimony in the case and found nothing wrong and, at a motions hearing in 2017, he falsely stated that the FBI had concluded that Agent Malone had testified properly and done nothing wrong in Huffington's case. There is a vast difference between receiving a report with information that does not invalidate an

expert's testimony and receiving a report that states an expert's testimony had been reviewed and found to contain "nothing wrong" or to be "proper." As the hearing judge found, Cassilly knew that the statements that he made to Judge Adams were false.

That Judge Adams testified at the disciplinary hearing that she believes Cassilly to be "a man of integrity" and that Cassilly contends he had no motive to mislead the circuit court does not negate the conclusion that Cassilly violated Rule 3.3(a)(1). See Keating, 471 Md. at 649, 243 A.3d at 541; Steinhorn, 462 Md. at 197, 198 A.3d at 828. The circumstance that Cassilly has maintained a good reputation in the community or may have had no discernable motive (other than having Huffington's convictions upheld) for making false statements to the circuit court is not dispositive of the charged rule violation. As we stated in Steinhorn, 462 Md. at 197, 198 A.3d at 828, "[w]hat matters for purposes of finding a[ Rule] 3.3(a)(1) violation is whether an attorney knows that the information he or she presents to the tribunal is incorrect." (Citation omitted). Here, clear and convincing evidence supports the hearing judge's conclusion that Cassilly violated Rule 3.3(a)(1) by knowingly making false statements of fact to the circuit court on four occasions.

### Rule 3.4(a) (Fairness to Opposing Party and Counsel)

The hearing judge concluded that Cassilly "violated Rule 3.4(a) when he disposed of the Robertson Report without maintaining a copy in the State's file and then sought to destroy the evidence that was the subject of the report." (Citation omitted).

Rule 3.4(a) provides that "[a]n attorney shall not[] unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. An attorney shall not counsel or assist another

person to do any such act[.]" (Paragraph break omitted). Comment [2] to Rule 3.4 states in relevant part:

> Documents and other items of evidence are often essential to establish a claim or defense. Subject to evidentiary privileges, the right of an opposing party, including the government, to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is altered, concealed or destroyed.

In Attorney Grievance Comm'n v. White, 354 Md. 346, 354, 350, 731 A.2d 447, 452, 450 (1999), this Court overruled an attorney's exception to the hearing judge's conclusion that the attorney violated Rule 3.4(a) where a judge of the United States District Court for the District of Maryland found, among other things, that the attorney had "engaged in an action of destruction of parts of an autobiographical manuscript, a substantial portion of which covered events bearing on her claims before the court" and "that she knowingly and willfully intended to destroy discoverable and relevant evidence, and that her statements to the contrary were not believable[.]"

In this case, clear and convincing evidence supports the hearing judge's conclusion that Cassilly violated Rule 3.4(a). Cassilly received the Robertson Report in 1999. At the disciplinary hearing, Cassilly testified that he discarded the Robertson Report and the 1997 Report "five years later or whatever it was" and that he then forgot about them. Cassilly never provided a copy of the Robertson Report to Huffington's counsel and did not maintain a copy of the report in the State's file. What is more, on August 28, 2003, in response to the petition to preserve forensic evidence and conduct DNA analysis filed by Huffington, Cassilly opposed the petition and requested permission from the circuit court to destroy the forensic evidence in Huffington's case, *i.e.*, the hairs that Huffington sought

to have analyzed.  The hearing judge rejected Cassilly's testimony that, at the time he filed the response to the petition to preserve forensic evidence and conduct DNA testing, he did not remember that there had been a report reviewing Agent Malone's testimony.  It is well established that "the hearing judge is in the best position to ascertain the credibility of a witness and we generally defer to the hearing judge's credibility determinations." Attorney Grievance Comm'n v. Miller, 467 Md. 176, 204, 223 A.3d 976, 993 (2020) (citation omitted).  In short, Cassilly discarded the Robertson Report, did not advise Huffington and his counsel that he had ever received the report, which was "a document . . . having potential evidentiary value[,]" Rule 3.4(a), and later sought to have the forensic evidence that was the subject of the Robertson Report destroyed.  Disturbingly, Cassilly made the request to have the forensic evidence destroyed even though he knew that the accuracy of Agent Malone's testimony had been called into question.  It is evident that the hearing judge's conclusion that Cassilly violated Rule 3.4(a) is supported by clear and convincing evidence.

### Rule 3.8(d) (Special Responsibilities of a Prosecutor)

The hearing judge concluded that Cassilly violated Rule 3.8(d) by failing to disclose the Robertson Report and the 2014 DOJ letters, which the hearing judge determined were exculpatory.  The hearing judge concluded that Rule 3.8(d) is not limited by Brady or Maryland Rule 4-263(j).[17]  The hearing judge determined that the plain language of Rule

---

[17]Maryland Rule 4-263(j) provides that "[e]ach party is under a continuing obligation to produce discoverable material and information to the other side.  A party who has responded to a request or order for discovery and who obtains further material information shall supplement the response promptly."

3.8(d) supports the conclusion that the disclosure obligation set forth in Rule 3.8(d) extends after conviction. The hearing judge observed that "Rule 3.8(d) does not make any mention of exculpatory information obtained only pre-trial or during trial" and instead requires that a prosecutor "disclose 'evidence or information' that 'tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigation information known to the prosecutor[.]'" (Quoting Rule 3.8(d)). The hearing judge explained that Jezic, Bar Counsel's expert witness, testified that the requirement set forth in Rule 3.8(d) that a prosecutor disclose information that "'tends to negate [the] guilt [of the accused] or mitigates the offense' is a 'very low standard,' and is far lower than the *Brady* materiality requirement."

Although Cassilly does not specifically mention Rule 3.8(d), he excepts to the hearing judge's conclusion that the Robertson Report contained exculpatory information and contends, among other things, that the hearing judge failed to give any credibility or weight to Judge Murphy's testimony that the document was not exculpatory. Cassilly argues that the hearing judge's conclusion that the failure to provide the 2014 DOJ letters was a discovery violation is erroneous because at the time the DOJ issued its letters criticizing Agent Malone's testimony, DNA testing had confirmed that Huffington's DNA did not match the hairs tested by Agent Malone, Huffington had been granted a new trial, and Cassilly no longer intended to call Agent Malone as a witness for the State. In addition, Cassilly argues that, at the disciplinary hearing, Judge Murphy testified that "there is a different analysis of exculpatory based on whether the" obligation to disclose evidence arises pretrial or post-trial. We overrule Cassilly's exception as to the hearing judge's

- 52 -

determination that he violated Rule 3.8(d) by failing to disclose the Robertson Report.

Rule 3.8(d) provides that:

The prosecutor in a criminal case shall[] . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

Recently, in Canales-Yanez v. State, 472 Md. 132, 135, 158, 244 A.3d 1096, 1098, 1111-12 (2021), a murder case in which a defendant asserted a Brady violation after conviction but prior to sentencing, this Court discussed Brady violations, explaining:

"*Brady v. Maryland* and its progeny guarantee to a criminal defendant who stands trial the right to receive material exculpatory and impeachment evidence in the possession of the State." *Byrd v. State*, 471 Md. 359, 372, 241 A.3d 913 (2020) (citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). . . .
    In order to establish that the State has violated his due process rights under *Brady v. Maryland*, Petitioner must establish: "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." *Ware*, 348 Md. [19,] 38, 702 A.2d 699 [(1997)] (citations omitted).

In Canales-Yanez, 472 Md. at 159, 244 A.3d at 1112, we stated that

the Supreme Court has held that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. This Court has interpreted a reasonable probability within this context as meaning a substantial possibility.

(Cleaned up). In assessing materiality within the context of suppressed impeachment evidence, this Court has identified several factors, including:

[1] the specificity of the defendant's request for disclosure of materials; [2] the closeness of the case against the defendant and the cumulative weight of the other independent evidence of guilt; [3] the centrality of the particular witness to the State's case; [4] the significance of the inducement to testify; [5] whether and to what extent the witness's credibility is already in question; and [6] the prosecutorial emphasis on the witness's credibility in closing arguments. Some of those considerations may point in one direction, some in another. The ultimate determination of materiality must arise from a composite, an amalgam, of them.

Id. at 159-60, 244 A.3d at 1112 (cleaned up) (alterations in original). In Canales-Yanez, id. at 160, 244 A.3d at 1112, this Court reviewed the factors used to determine materiality and affirmed the trial court's ruling that the suppressed evidence was not material because there was "not a reasonable probability (or, put otherwise, a substantial possibility) that it would have altered the outcome of the trial." Our holding in Canales-Yanez, id. at 167, 244 A.3d at 1116, was limited to analyzing whether the undisclosed evidence was material to the defendant's case—not an analysis of whether the undisclosed evidence was exculpatory in the first instance. Because we concluded that the evidence was not material and did not hamper the defendant's trial strategy, we concluded that the nondisclosure of the evidence did not constitute a violation of Brady. See Canales-Yanez, 472 Md. at 167, 244 A.3d at 1117.

Generally speaking, "[f]or *Brady v. Maryland* purposes, exculpatory evidence is evidence that goes to the heart of the defendant's guilt or innocence, while impeachment evidence is that which has the potential to alter the jury's assessment of the credibility of a significant prosecution witness." Byrd v. State, 243 Md. App. 616, 624, 221 A.3d 1085, 1089-90 (2019), aff'd, 471 Md. 359, 241 A.3d 913 (2020) (citing United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998)). This Court has stated that "[i]mpeachment evidence,

as well as exculpatory evidence, is evidence favorable to an accused." Conyers v. State, 367 Md. 571, 597, 790 A.2d 15, 31 (2002) (cleaned up). See also Williams v. State, 416 Md. 670, 692, 7 A.3d 1038, 1051 (2010) ("In order to establish a *Brady* violation, petitioner must prove that the State suppressed favorable evidence.").

As we observed in Grandison v. State, 390 Md. 412, 432, 889 A.2d 366, 378 (2005), "*Brady* jurisprudence predominantly addresses the materiality prong[,]" and not whether undisclosed evidence is favorable to the defense, *i.e.*, exculpatory. (Citations omitted). In Grandison, 390 Md. at 433, 889 A.2d at 378, we observed that because a defendant's claim of a Brady violation ultimately turned on whether the evidence was material, we assumed for the sake of argument that the evidence was withheld and was favorable to the defendant. In other words, we did not determine whether the evidence was exculpatory in the first place.

In Imbler v. Pachtman, 424 U.S. 409, 427 (1976), a case in which the Supreme Court held that prosecutors have the same absolute immunity under 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights) that they have under common law, the Supreme Court explained that "the ultimate fairness" of the criminal justice system "could be weakened by subjecting prosecutors" to liability under 42 U.S.C. § 1983, stating:

> Various post-trial procedures are available to determine whether an accused has received a fair trial. These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

(Footnote omitted). The Supreme Court explained that a prosecutor has a duty to disclose evidence indicative of innocence or mitigation, stating:

> The possibility of personal liability also could dampen the prosecutor's exercise of his duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction. Cf. ABA Code of Professional Responsibility s EC 7-13 (1969); ABA Standards, supra, s 3.11.

Imbler, 424 U.S. at 427 n.25. The Supreme Court recognized that the prospect of personal liability in civil litigation could undermine a prosecutor's fulfillment of the duty to disclose information that casts doubt on the correctness of a conviction and that the duty exists postconviction. See id.

We have not had occasion to interpret or construe Rule 3.8(d) previously and Cassilly has not directed our attention to any case in which Rule 3.8(d) or a similar rule has been construed by another court. Cassilly's exceptions essentially raise the issue of whether a prosecutor's obligation under Rule 3.8(d)—to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense"—applies to disclosures to be made after trial, such as in postconviction proceedings, and call upon us to explain the meaning of the language "tends to negate the guilt of the accused[.]" In Green v. State, 456 Md. 97, 125, 171 A.3d 1162, 1177-78 (2017), we discussed the standard for interpreting a Maryland Rule:

A court interprets a Maryland Rule by using the same canons of construction

that the court uses to interpret a statute. First, the court considers the Rule's plain language in light of: (1) the scheme to which the Rule belongs; (2) the purpose, aim, or policy of this Court in adopting the Rule; and (3) the presumption that this Court intends the Rules and this Court's precedent to operate together as a consistent and harmonious body of law. If the Rule's plain language is unambiguous and clearly consistent with the Rule's apparent purpose, the court applies the Rule's plain language. Generally, if the Rule's plain language is ambiguous or not clearly consistent with the Rule's apparent purpose, the court searches for rulemaking intent in other indicia, including the history of the Rule or other relevant sources intrinsic and extrinsic to the rulemaking process, in light of: (1) the structure of the Rule; (2) how the Rule relates to other laws; (3) the Rule's general purpose; and (4) the relative rationality and legal effect of various competing constructions.

Where a Rule's language is clear, a court neither adds nor deletes language so as to reflect an intent not evidenced in the plain and unambiguous language of the Rule. Unambiguous language will be given its usual, ordinary meaning unless doing so creates an absurd result.

(Cleaned up).

With these principles in mind, we turn first to the plain language of Rule 3.8(d) and address whether the Rule applies to postconviction proceedings. By its plain language, Rule 3.8(d) states that a prosecutor in a criminal case shall "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]" The plain language of Rule 3.8(d) neither excludes nor includes postconviction proceedings and instead simply imposes an obligation on a prosecutor to disclose all evidence or information that tends to negate the guilt of the accused or mitigates the offense. The guilt of the accused may be challenged at various phases of a criminal proceeding—pretrial, during trial, and after trial on appeal and in postconviction proceedings. In this case, Huffington clearly challenged

his conviction and guilt post-trial in a variety of ways—through appeals, petitions for postconviction relief, an application for leave to appeal the denial of the second petition for postconviction relief, a petition for a writ of habeas corpus, a petition to preserve forensic evidence and conduct DNA analysis, and a petition for a writ of actual innocence. Comment [1] to Rule 3.8 provides that "[a] prosecutor has the responsibility of a minister of justice" and such a "responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." In our view, the plain language of Rule 3.8(d) and accompanying comment lead to the conclusion that a prosecutor's disclosure obligations under Rule 3.8(d) apply pretrial, during trial, and after trial on appeal and in postconviction proceedings in which a defendant challenges guilt. To be sure, the Rule does not expressly refer to post-trial proceedings, but it is well established that a defendant may challenge guilt post-trial.[18] See, e.g., Md. Code Ann., Crim. Proc. (2001, 2018 Repl. Vol.) ("CP") §§ 8-301 (Petition for Writ of Actual Innocence), 8-201 (Petition for DNA Testing and Preservation of Scientific Identification Evidence), 7-102 (Right of Convicted Person to Begin Proceeding Under Uniform Postconviction Procedure Act).

The phrase "all evidence or information known to the prosecutor that tends to negate the guilt of the accused" means exactly what it says. Black's Law Dictionary defines the word "tend" as "[t]o be disposed toward (something)[,]" "[t]o serve, contribute, or conduce

_____

[18]We note that Rule 3.8(d) expressly refers only to one phase of a criminal proceeding—sentencing—in a separate clause and requires that, with respect to sentencing, a prosecutor in a criminal case must "disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor[.]"

in some degree or way; to have a more or less direct bearing or effect[,]" and "[t]o be directed or have a tendency to (an end, object, or purpose)." *Tend*, Black's Law Dictionary (11th ed. 2019). "Negate" means "[t]o deny" and "[t]o nullify; to render ineffective." *Negate*, Black's Law Dictionary (11th ed. 2019). And, generally speaking, "guilt" is "[t]he fact, state, or condition of having committed a wrong, esp[ecially] a crime[.]" *Guilt*, Black's Law Dictionary (11th ed. 2019). The meaning of the phrase in Rule 3.8(d), when the key words are accorded their plain language interpretation as set forth in Black's Law Dictionary, is that a prosecutor is obligated to timely disclose all evidence or information known to the prosecutor that shows in some degree or way that the guilt of the accused is nullified, *i.e.*, that serves to render ineffective or deny the guilt of the accused. Clearly, such evidence or information may come to light after a conviction and require that a prosecutor timely disclose that evidence or information.

Moreover, the language in Comment [1] to the Rule states that a prosecutor's "responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." This language leads to the conclusion that instances in which a defendant challenges procedural matters, whether pretrial, during trial, or after trial, give rise to a prosecutor's duty to disclose information that tends to negate the guilt of the accused. Thus, a plain reading of Rule 3.8(d) and Comment [1] to the Rule leads to the determination that the Rule applies to a prosecutor's obligation to disclose information that negates guilt in postconviction proceedings.

A comprehensive review of the rulemaking history of Rule 3.8 reinforces the

conclusion that Rule 3.8(d) applies to postconviction proceedings.  Rule 3.8 was adopted

by this Court in 1986 and took effect on January 1, 1987.  Because the history of our Rule

3.8 is entwined with the history of the American Bar Association ("ABA") Model Rules

of Professional Conduct, and specifically ABA Model Rule 3.8, we will also discuss the

relevant history of the ABA Model Rules.

In 1908, the ABA adopted the Canons of Ethics, which remained in effect until

1969.  Canon 5 provided:

> **5. The Defense or Prosecution of Those Accused of Crime.**
> It is the right of the lawyer to undertake the defense of a person accused of
> crime, regardless of his personal opinion as to the guilt of the accused;
> otherwise innocent persons, victims only of suspicious circumstances, might
> be denied proper defense.  Having undertaken such defense, the lawyer is
> bound by all fair and honorable means, to present every defense that the law
> of the land permits, to the end that no person may be deprived of life or
> liberty, but by due process of law.
>      The primary duty of a lawyer engaged in public prosecution is not to
> convict, but to see that justice is done.  The suppression of facts or the
> secreting of witnesses capable of establishing the innocence of the accused
> is highly reprehensible.

On August 12, 1969, the ABA House of Delegates adopted the ABA Model Code

of Professional Responsibility, which remained in effect until 1983.  The Model Code

included Canons, along with accompanying Ethical Considerations ("EC") and

Disciplinary Rules ("DR").  Canon 7 of the Model Code provided that "a lawyer should

represent a client zealously within the bounds of the law[.]"  (Cleaned up).  EC 7-13

provided:

> The responsibility of a public prosecutor differs from that of the usual
> advocate; his duty is to seek justice, not merely to convict.  This special duty
> exists because: (1) the prosecutor represents the sovereign and therefore
> should use restraint in the discretionary exercise of governmental powers,

such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts. With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.

(Footnote omitted). DR 7-103, entitled "Performing the Duty of Public Prosecutor or Other Government Lawyer[,]" of the Model Code provided in its entirety:

(A) -A public prosecutor or other government lawyer shall not institute or cause to be instituted criminal charges when he knows or it is obvious that the charges are not supported by probable cause.
(B) -A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.

In 1977, the ABA Commission on Evaluation of Professional Standards, also known as the Kutak Commission, was created to draft new Model Rules of Professional Conduct. In a report to the ABA House of Delegates in 1983, the Kutak Commission proposed that the text of ABA Model Rule 3.8(d) provide as follows:

The prosecutor in a criminal case shall[] . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

The Kutak Commission proposed that Comment 1 to ABA Model Rule 3.8 provide in

relevant part: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." The Kutak Commission also proposed that Comment 3 provide: "The exception in paragraph (d) recognizes that a prosecutor may seek an appropriate protective order from the tribunal if disclosure of information to the defense could result in substantial harm to an individual or to the public interest." In 1983, the ABA House of Delegates adopted the ABA Model Rules of Professional Conduct. At that time, the ABA House of Delegates adopted ABA Model Rule 3.8(d) and the above-quoted portions of Comments 1 and 3, as proposed by the Kutak Commission, without amendment.

On October 27, 1983, the Chief Judge of this Court appointed the Select Committee of the Court of Appeals of Maryland to Study the ABA Model Rules of Professional Conduct to study the Model Rules and to make recommendations to the Court concerning their adoption in Maryland. The Select Committee submitted to this Court a report recommending adoption of the ABA Model Rules of Professional Conduct with various proposed amendments in the form of the Maryland Rules of Professional Conduct and Comments. The Select Committee reported that it "unanimously agreed that the Model Rules provide[d] a better format, and in most respect, a better substantive standard for lawyer conduct than d[id] the Maryland [Code of Professional Responsibility]." As such, the Select Committee recommended the adoption of the ABA Model Rules and the accompanying Comments, with certain changes, to replace the existing Maryland Code of Professional Responsibility.

In an appendix to the report, the Select Committee advised that the "Appendix restate[d] the Model Rules as adopted with the recommended changes of the Select [C]ommittee shown in legislative style, i.e., deletions are indicated by [ ] and additions by the use of CAPITALS." In the appendix, the Select Committee proposed adoption of ABA Model Rule 3.8(d) with no deletions or additions as follows:

> The prosecutor in a criminal case shall[] . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

In a meeting of the Standing Committee on Rules of Practice and Procedure ("the Rules Committee") on February 15, 1985, a member of the Select Committee presented the proposed version of Maryland Rule of Professional Conduct 3.8 for consideration. The minutes of the meeting reflect that the Select Committee had made no change to ABA Model Rule 3.8:

> [The Select Committee member] said that the Select Committee had made no changes to [ABA Model] Rule 3.8. The State Bar Association Criminal Law Section essentially agrees with this version of the Rule. They had sent in a comment asking for additional requirements that prosecutors must behave, must make timely disclosures, etc. Judge Wilner asked if any comments had been received from State's Attorneys, and [the member] replied that none had been received.

The meeting minutes reflect that section (d) of Rule 3.8 was not specifically mentioned.

On April 15, 1986, this Court issued a Rules Order adopting amendments to the Maryland Rules of Professional Conduct, to take effect on January 1, 1987. At the time, Rule 3.8(d) read, just as the Select Committee had proposed, as follows:

The prosecutor in a criminal case shall[] . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

The Comment to Rule 3.8 stated in relevant part: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." The Comment further stated: "The exception in paragraph (d) recognizes that a prosecutor may seek an appropriate protective order from the tribunal if disclosure of information to the defense could result in substantial harm to an individual or to the public interest." Rule 3.8(d) and the Comment, as adopted by this Court, directly mirrored ABA Model Rule 3.8(d) and the Comments to ABA Model Rule 3.8, respectively, as adopted by the ABA House of Delegates in 1983. A note entitled "Code Comparison" accompanying Rule 3.8 stated:

> DR 7-103(A) provides that "A public prosecutor . . . shall not institute . . . criminal charges when he knows or it is obvious that the charges are not supported by probable cause." DR 7-103(B) provides that "A public prosecutor . . . shall make timely disclosure . . . of the existence of evidence, known to the prosecutor . . . that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."

(Ellipses in original).

In 1997, the ABA formed the Ethics 2000 Commission to review the ABA Model Rules of Professional Conduct. The Ethics 2000 Commission submitted a report to the ABA House of Delegates at the August 2001 Annual Meeting. The House of Delegates debated the report at both the August 2001 Annual Meeting and the February 2002 Midyear

- 64 -

Meeting. At the end of the February 2002 Midyear Meeting, no changes were made to

ABA Model Rule 3.8(d) as a result of the Ethics 2000 Commission's report. At that time,

however, ABA Model Rule 3.8(e) was amended and new paragraphs (e) and (f) were

adopted.[19]

In response to the ABA's amendment to its Model Rules, this Court appointed a

Select Committee to Study the Ethics 2000 Amendments to the ABA Model Rules of

Professional Conduct. The Select Committee submitted to this Court a report

recommending adoption of the Ethics 2000 Amendments to the ABA Model Rules of

---

[19]As a result of the Ethics 2000 Commission report, ABA Model Rule 3.8 was amended, with paragraph (e) relocating to paragraph (f), and a new paragraph (e) added, to provide:

The prosecutor in a criminal case shall:

. . .

(e) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless the prosecutor reasonably believes:
   (1) the information sought is not protected from disclosure by any applicable privilege;
   (2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and
   (3) there is no other feasible alternative to obtain the information;

(f) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule.

Professional Conduct with various proposed amendments to the MLRPC and Comments.

On February 8, 2005, this Court issued a Rules Order adopting amendments to the MLRPC, to take effect on July 1, 2005. At that time, the language of Rule 3.8(d) remained unchanged.

The Comment to Rule 3.8, though, was split into separate numbered Comments. As such, Comment [1] to Rule 3.8 read in relevant part: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Comment [3] to Rule 3.8 stated: "The exception in paragraph (d) recognizes that a prosecutor may seek an appropriate protective order from the tribunal if disclosure of information to the defense could result in substantial harm to an individual or to the public interest." A note entitled "Model Rules Comparison" stated: "Rule 3.8 has been rewritten to retain elements of existing Maryland language and to incorporate some changes from the Ethics 2000 Amendments to the ABA Model Rules. ABA Model Rule 3.8(e) has not been adopted."[20]

_____

[20]Although we did not adopt ABA Model Rule 3.8(e), our Rule 3.8(e) was substantially similar to ABA Model Rule 3.8(f) and provided:

> The prosecutor in a criminal case shall: . . . except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent an employee or other person under the control of the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule.

On July 1, 2011, the Rules Committee submitted to this Court its One Hundred Seventy-First Report, and included proposed amendments to certain Maryland Rules, including Rule 3.8, to make a stylistic change by replacing the term "pro se" with the term "self-represented." No other changes to Rule 3.8 were proposed. On September 8, 2011, this Court issued a Rules Order adopting the amendment to Rule 3.8, to take effect on January 1, 2012.

Effective July 1, 2016, MLRPC 3.8 was renamed MARPC 3.8 and relocated to Title 19 of the Maryland Rules, and renumbered as Maryland Rule 19-303.8, without substantive change, along with all of the other MLRPCs. The note concerning "Model Rules Comparison" stated as it previously had that Rule 3.8 "has been rewritten to retain elements of existing Maryland language and to incorporate some changes from the Ethics 2000 Amendments to the ABA Model Rules. ABA Model Rule 3.8(e) has not been adopted."

Thus, a review of its rulemaking history demonstrates that since January 1, 1987, Rule 3.8(d) has provided and continues to provide as follows:

> The prosecutor in a criminal case shall[] . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

In 2008, however, ABA Model Rule 3.8 was amended to add new paragraphs (g) and (h) to specifically set forth postconviction obligations for prosecutors and provide as follows:

> (g) When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense

- 67 -

of which the defendant was convicted, the prosecutor shall:

> (1) promptly disclose that evidence to an appropriate court or authority, and
>
> (2) if the conviction was obtained in the prosecutor's jurisdiction,
>
>> (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and
>>
>> (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit.

(h) When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction.

Two new Comments were also added to ABA Model Rule 3.8:

[7] When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a person outside the prosecutor's jurisdiction was convicted of a crime that the person did not commit, paragraph (g) requires prompt disclosure to the court or other appropriate authority, such as the chief prosecutor of the jurisdiction where the conviction occurred. If the conviction was obtained in the prosecutor's jurisdiction, paragraph (g) requires the prosecutor to examine the evidence and undertake further investigation to determine whether the defendant is in fact innocent or make reasonable efforts to cause another appropriate authority to undertake the necessary investigation, and to promptly disclose the evidence to the court and, absent court-authorized delay, to the defendant. Consistent with the objectives of Rules 4.2 and 4.3, disclosure to a represented defendant must be made through the defendant's counsel, and, in the case of an unrepresented defendant, would ordinarily be accompanied by a request to a court for the appointment of counsel to assist the defendant in taking such legal measures as may be appropriate.

[8] Under paragraph (h), once the prosecutor knows of clear and convincing evidence that the defendant was convicted of an offense that the defendant did not commit, the prosecutor must seek to remedy the conviction. Necessary steps may include disclosure of the evidence to the defendant, requesting that the court appoint counsel for an unrepresented indigent defendant and, where appropriate, notifying the court that the prosecutor has knowledge that the defendant did not commit the offense of which the defendant was convicted.

The Annotation accompanying ABA Model Rule 3.8 explains, in relevant part:

> In 2008 paragraphs (g) and (h) were added to Rule 3.8. They create post-conviction duties for prosecutors to disclose "new, credible and material evidence" they come to know of that "creat[es] a reasonable likelihood that a convicted defendant did not commit an offense" (paragraph (g)), and to "seek to remedy [a] conviction" when they come to know of "clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction" did not commit the offense for which he or she was convicted (paragraph (h)).

(Alterations in original) (citations omitted). ABA Model Rule 3.8(d) remained the same.

There is no indication in the rulemaking history of our Rule 3.8 that language similar to the language added to ABA Model Rule 3.8 in sections (g) and (h) in 2008 has ever been considered by the Rules Committee or presented to this Court for consideration. In our view, ABA Model Rule 3.8(g) and (h) explicitly state what is inherent in Rule 3.8(d). That this Court has not adopted such language is no indication whatsoever that the Rules Committee and the Court did not intend Rule 3.8(d) to apply to postconviction proceedings, given that the rulemaking history for Rule 3.8(d) does not demonstrate that either the Court or the Rules Committee considered such an amendment and rejected it. In short, the rulemaking history does not reflect an intent that a prosecutor's obligations under Rule 3.8(d) would not apply to disclosures required to be made postconviction.

The 2008 amendment of ABA Model Rule 3.8 was intended to codify the ethical principle recognized by the Supreme Court as early as 1976 in Imbler, namely, that prosecutors are bound after a conviction to disclose information that casts doubt on the correctness of the conviction. In a report dated February 2008, accompanying the Recommendation of the ABA Section of Criminal Justice that proposed paragraphs (g) and

(h) be added to ABA Model Rule 3.8, authored by Stephen Saltzburg, the Chair of the ABA

Section of Criminal Justice, Saltzburg stated in pertinent part:

> The United States Supreme Court recognized in *Imbler v. Pachtman*, 424 U.S. 409, 427 n. 25 (1976), that prosecutors are "bound by the ethics of [their] office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction." Further, when a prosecutor concludes upon investigation of such evidence that an innocent person was convicted, it is well recognized that the prosecutor has an obligation to endeavor to rectify the injustice. These obligations have not, however, been codified in Rule 3.8 of the ABA Model Rules of Professional Conduct, which identifies the "Special Responsibilities of a Prosecutor." Proposed Rules 3.8(g) and (h), and the accompanying Comments would rectify this omission.

(Alteration in original) (footnote omitted). In addition, Saltzburg stated: "Model Rule 3.8

already exists. This recommendation will add two provisions in order to strengthen the

responsibility of prosecutors to take action when confronted with evidence of innocence."

It is clear that, based on the Supreme Court's holding in Imbler and ABA Model Rule

3.8(d), the obligation to disclose post-trial information that casts doubt on a conviction

already existed. Indeed, in Imbler, 424 U.S. at 427 n.25, in discussing a prosecutor's post-

trial duty to disclose information that would call into question a conviction, the Supreme

Court cited ABA Model Code of Professional Responsibility EC 7-13. The amendment of

the ABA Model Rule 3.8 to add paragraphs (g) and (h) made the post-trial disclosure

requirement explicit. Requiring such disclosure is consistent with the plain language of

our Rule 3.8(d), under which a prosecutor must disclose evidence that tends to negate the

guilt of the accused.

What can be gleaned from our rulemaking history is that the plain language of Rule

3.8(d) containing the requirement that a prosecutor "make timely disclosure to the defense

of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense" applies to a prosecutor's obligation to make disclosures postconviction. From our perspective, it would not be consistent with the plain language of Rule 3.8(d), Comment [1] to the Rule, the Supreme Court's holding in Imbler, or our case law concerning Brady to construe Rule 3.8(d) to apply only to pretrial or trial disclosures.[21] Nor would it be consistent with our obligation to protect the public.

With these principles in mind, we conclude that clear and convincing evidence supports the hearing judge's conclusion that Cassilly violated Rule 3.8(d) by failing to disclose the Robertson Report to Huffington's counsel, as it constituted evidence that tended to negate Huffington's guilt. The plain language of Rule 3.8(d) sets forth its own standard for disclosure, requiring the disclosure of "all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense," which is similar to the language used in Brady and our case law describing the requirement to disclose evidence that is "favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness[,]" Canales-Yanez, 472 Md. at 158, 244 A.3d at 1111-12 (citation omitted). Although the language is slightly different, clearly, evidence that tends to negate the guilt of the accused is a close cousin to exculpatory evidence.

Maryland Rule 4-263(d), concerning a State's Attorney's disclosure requirements

---

[21]Given, however, that ABA Model Rule 3.8 has been amended to expressly address postconviction obligations for prosecutors in paragraphs (g) and (h), we think it prudent that a similar amendment of Rule 3.8 be considered by our Rules Committee and we refer the matter to the Rules Committee.

pretrial, provides in subsection (5) that "the State's Attorney shall provide to the defense[] . . . *Exculpatory Information.* All material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged[.]" This language closely tracks a prosecutor's disclosure requirements under Rule 3.8(d)—that the prosecutor must "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense[.]" Under Brady, "exculpatory evidence is evidence that goes to the heart of the defendant's guilt or innocence[,]" Byrd, 243 Md. App. at 624, 221 A.3d at 1089 (citation omitted), and "is evidence favorable to an accused[,]" Conyers, 367 Md. at 597, 790 A.2d at 31 (cleaned up).

The hearing judge correctly determined that information in the Robertson Report concerning Agent Malone's testimony was exculpatory.[22] In the report, Robertson stated that there was "insufficient documentation to determine if the hair comparison was performed in a scientifically acceptable manner" and that "[t]he results [were] not adequately documented in the notes." These determinations were highly relevant to the

---

[22]We are unpersuaded by Cassilly's contention that the hearing judge failed to give sufficient credibility or weight to Judge Murphy's expert testimony as to whether the Robertson Report or 2014 DOJ letters constituted exculpatory evidence. Certainly, in her opinion, the hearing judge expressly credited Jezic's expert testimony. That does not mean, however, that the hearing judge failed to consider Judge Murphy's testimony. As is well established, "[g]enerally, a hearing judge maintains a great deal of discretion in determining which evidence to rely upon" and "in making his or her findings of fact, the hearing judge is permitted to pick and choose which evidence to rely upon from the conflicting array of facts presented." Miller, 467 Md. at 195, 223 A.3d at 987 (cleaned up); see also Attorney Grievance Comm'n v. Kepple, 432 Md. 214, 225, 68 A.3d 797, 803 (2013) ("[T]he hearing judge is appropriately responsible for, and charged with, weighing the credibility of witnesses and resolving any conflict in the evidence." (Cleaned up)).

reliability and accuracy of Agent Malone's trial testimony and constituted evidence that tended to negate Huffington's guilt. These conclusions, especially when considered in light of the other information that had already come to bear concerning credibility issues with Agent Malone (*e.g.*, the information provided by the DOJ to Cassilly concerning Agent Malone's false testimony in the Hastings case), constituted exculpatory evidence, *i.e.*, evidence favorable to Huffington that tended to negate his guilt.[23]

At Huffington's second trial, notwithstanding other evidence presented by the State, key forensic evidence consisted of hair samples recovered from Becker's trailer, which Agent Malone testified "microscopically matched the head hairs of [Huffington] – that is, they were indistinguishable from [Huffington's] head hairs; you could not tell them apart." Agent Malone essentially identified Huffington as the source of the hairs recovered from Becker's trailer and in doing so identified Huffington as the criminal agent. To be sure, on cross-examination, Agent Malone acknowledged that microscopic hair comparison cannot be utilized as a means of positive personal identification; but, this did not contradict his testimony that the hair sample at issue was identical to Huffington's hair.

In the circuit court's opinion granting a new trial, which was admitted into evidence at the disciplinary hearing, the circuit court stated that Agent Malone's testimony "was the

---

[23]We note that both the Robertson Report and the 2014 DOJ letters would obviously have constituted impeachment evidence had Cassilly intended to call Agent Malone at the third trial, as the report and letters would have had "the potential to alter the jury's assessment of the credibility of a significant prosecution witness[,]" Byrd, 243 Md. App. at 624, 221 A.3d at 1090 (citation omitted), and would have been relevant if Agent Malone testified, see Adams v. State, 165 Md. App. 352, 380-81, 885 A.2d 833, 850 (2005), cert. denied, 391 Md. 577, 894 A.2d 545 (2006).

first piece of evidence the State referenced in its closing argument regarding [Huffington]'s connection to Becker's murder, as well as was referenced by the State in its opening statement." (Footnote omitted). The circuit court noted that, during the State's closing argument, the prosecutor stated that "the FBI determined that the head hair found on the stocking and garter of [] Becker and the sheet from the bed where [Becker] was killed, was microscopically identical to the head hair of this defendant." At the disciplinary hearing, Bar Counsel's expert, Jezic, testified that, in the circuit court's opinion granting a new trial, the court "reference[d] how the prosecutor in closing mentioned as the number one piece of evidence t[ying] Huffington to Diane Becker's murder, was the opinion of [Agent] Malone; and, the prosecutor said that [Agent] Malone provided testimony that the hairs were microscopically identical." It is plain that the information contained in the Robertson Report tended to negate Huffington's guilt by detracting from a key piece of forensic evidence used by the State to place Huffington at the scene of the crime as the criminal agent. Jezic testified that, in his opinion,

> if the testimony of [Agent] Malone with respect to these hairs was either challenged with respect to the items in the Robertson Report via cross, or expert testimony would have been provided attacking his opinion consistent with the Robertson Report, that would have tended to negate the guilt of [] Huffington, that low standard tended to negate, or would have tended to mitigate the punishment at sentencing when he was -- when the death penalty was overturned and he was given two consecutive life sentences plus 18 years.

Jezic's testimony alone supports the conclusion that the Robertson Report was exculpatory evidence that tended to negate Huffington's guilt, and that, as such, Cassilly was required under Rule 3.8(d) to make timely disclosure of the report to the defense, which he failed to

- 74 -

do.[24]

[24]Cassilly also excepts to the hearing judge's finding that there was a failure to disclose the 2014 DOJ letters and that the failure to provide the letters constituted a discovery violation. According to Cassilly, he disclosed the letters by contacting the DOJ and directing it to mail a copy of the 2014 DOJ letters to Huffington's counsel. As such, Cassilly contends that his action resulted in defense counsel receiving the 2014 DOJ letter. We overrule the exception. Plainly, the hearing judge did not err in any way in finding that Cassilly "did not provide a copy of the 2014 [DOJ] letters to [] Huffington or his counsel." This is accurate. The record demonstrates that the DOJ—not Cassilly—provided the 2014 DOJ letters to Huffington's counsel. The real substance of Cassilly's argument seems to be an exception to the hearing judge's finding that he had a duty to disclose the 2014 DOJ letters and that the failure to do so constituted a discovery violation.

The hearing judge concluded that Cassilly violated Maryland Rule 4-263(d)(8) by failing to disclose the 2014 DOJ letters because the letters contained the conclusions of an expert witness in regard to Huffington's case. We agree. Maryland Rule 4-263(d)(8) requires the State's Attorney in a criminal prosecution, without the necessity of a request, to disclose to the defense information regarding expert witnesses the State consults in connection with the action. Under Maryland Rule 4-263(d)(8)(B), as to each expert consulted, the State's Attorney must provide "the opportunity to inspect and copy all written reports or statements made in connection with the action by the expert, including the results of any physical or mental examination, scientific test, experiment, or comparison[.]" Pursuant to Maryland Rule 4-263(d)(8)(C), as to each expert consulted, the State's Attorney must provide "the substance of any oral report and conclusion by the expert[.]" The 2014 DOJ letters contained information from Wong, an expert who was consulted about Huffington's case. Although Cassilly did not initiate the contact with Wong or ask him to review the case, Wong, as Special Counsel to the DOJ, was asked to review Agent Malone's testimony and Cassilly, the prosecutor in Huffington's case, received the result.

Insofar as Rule 3.8(d) is concerned, the failure to disclose the 2014 DOJ letters pursuant to Maryland Rule 4-263(d)(8) did not automatically constitute a violation of Rule 3.8(d), as Maryland Rule 4-263(d)(8) does not solely require disclosure of exculpatory information from an expert witness tending to negate guilt, but rather requires disclosure of information about any expert witnesses consulted. In this case, the 2014 DOJ letters contained information that tended to negate guilt by undermining Agent Malone's previous trial testimony concerning the hair identification. But by the time Cassilly received the letters, DNA test results had excluded Huffington as a source of the evidence, and Cassilly proffered that, as a result, he no longer intended to call Agent Malone as a witness at the third trial. Although pursuant to Maryland Rule 4-263(d)(8), Cassilly would have been required to disclose the 2014 DOJ letters, under the circumstances of the case, we cannot say that the failure to do so violated Rule 3.8(d).

We are not persuaded by Cassilly's argument that the criticisms of Agent Malone's testimony were not material and that the hearing judge exaggerated the importance of Agent Malone's testimony to the State's case without due consideration of the other evidence in the case. As explained above, in the opinion granting a new trial, the circuit court discussed the emphasis given by the prosecution to Agent Malone's testimony, and at the disciplinary hearing, Jezic testified about the importance given to Agent Malone's testimony by the prosecutor in closing argument at Huffington's second trial. The hair match identification testimony was clearly key identification evidence, notwithstanding the presence of other evidence. To establish a Brady violation, a petitioner must establish "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense— either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." Canales-Yanez, 472 Md. at 158, 244 A.3d at 1111-12 (cleaned up). And, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 159, 244 A.3d at 1112 (cleaned up).

In our view, the undisclosed evidence in this case—the Robertson Report—was material because there was a reasonable probability that, had the evidence been disclosed, the result of the proceeding may have been different. As the circuit court discussed in its opinion and order granting the petition for a writ of actual innocence and ordering a new trial, Agent Malone's testimony constituted key forensic evidence linking Huffington to

- 76 -

the crime and Agent Malone's testimony was emphasized to the jury by the State. Quite

clearly, the Robertson Report was material because there was a reasonable probability that,

had the evidence been disclosed, the result of the proceeding would have been different—

as determined by the circuit court in granting Huffington a new trial.[25]

Plainly, clear and convincing evidence supports the hearing judge's conclusion that

Cassilly violated Rule 3.8(d) by failing to disclose the Robertson Report.

### Rule 8.1(b) (Failing to Respond to a Lawful Demand for Information)

Without specifying a section, the hearing judge concluded that Bar Counsel failed

to establish by clear and convincing evidence that Cassilly violated Rule 8.1. The hearing

judge explained:

> [Bar Counsel] alleges that [Cassilly] violate[d] Rule 8.1 by failing to comply

---

[25]Under <u>Brady</u>, exculpatory evidence and materiality are two different concepts. The language set forth in <u>Brady</u> and its progeny defining exculpatory evidence is very similar to the language used in Rule 3.8(d), "evidence or information . . . that tends to negate the guilt of the accused[.]" In <u>Canales-Yanez</u>, 472 Md. at 159, 244 A.3d at 1112, we stated "that evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." From our perspective, Rule 3.8(d) sets forth basic ethical obligations required of prosecutors consistent with the standards enunciated in our case law with respect to disclosure of evidence or information that tends to negate guilt or mitigate an offense. <u>See, e.g.</u>, <u>Brady</u>, 373 U.S. at 87-88; <u>Canales-Yanez</u>, 472 Md. at 158, 244 A.3d at 1111-12. In this case, it is not necessary that we determine whether Rule 3.8(d) requires a prosecutor to disclose evidence that tends to negate guilt when the evidence is not necessarily "material" under <u>Brady</u>. We note, though, that, in <u>Cone v. Bell</u>, 556 U.S. 449, 470 n.15 (2009), the Supreme Court stated: "Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations." (Citations omitted). Although we need not decide the issue of whether the requirements of Rule 3.8(d) exceed those set forth in <u>Brady</u> and its progeny, we, like the Supreme Court, caution that a "prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure." <u>Cone</u>, 556 U.S. at 470 n.15 (citations omitted).

with Bar Counsel's subpoena directing him to provide testimony under oath. However, [Cassilly] did appear at the Office of Bar Counsel on October 1, 2019 and attempted to cooperate with Bar Counsel. He stated that he refused to provide testimony under oath because some of the conduct in question had happened twenty years ago. The Court finds that he did not violate Rule 8.1.

Bar Counsel excepts to the hearing judge's conclusion that Cassilly did not violate Rule 8.1(b). Bar Counsel argues that Maryland Rule 19-712 authorizes it to issue to an attorney a subpoena in furtherance of an investigation requiring the attorney to give a statement under oath. Bar Counsel points out that Cassilly neither moved to quash the subpoena nor sought a protective order, but instead appeared and refused to take the oath. As such, Bar Counsel maintains that Cassilly's "refusal to take the oath constituted a knowing failure to respond to a lawful demand for information." (Citations omitted). We sustain Bar Counsel's exception.

Rule 8.1(b) provides in relevant part:

[A]n attorney . . . in connection with a disciplinary matter[] shall not . . . fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 19-301.6 (1.6).

An attorney violates Rule 8.1(b) by failing to respond to Bar Counsel's lawful requests for information and documentation. See Attorney Grievance Comm'n v. Hensley, 467 Md. 669, 686, 226 A.3d 41, 51 (2020).[26]

---

[26]In Attorney Grievance Comm'n v. Shuler, 454 Md. 200, 215, 164 A.3d 209, 217 (2017), this Court concluded that an attorney violated Rule 8.1(b) by failing to "meaningfully answer" the Bar Counsel's correspondence concerning her representation of a client. Bar Counsel sent three letters to the attorney before she provided a response to

Recently, in Attorney Grievance Comm'n v. Dailey, 474 Md. 679, 707-10, 255 A.3d 1068, 1084-85 (2021), we concluded that an attorney violated Rule 8.1(b) in two ways. As part of its investigation into the complaint filed against the attorney, Bar Counsel initially requested that the attorney schedule a statement under oath with the Office of Bar Counsel. See id. at 695-97, 255 A.3d at 1077. The attorney, however, failed to respond to Bar Counsel's offer to schedule a statement under oath on one of three proposed dates. See id. at 695-97, 255 A.3d at 1077. Accordingly, Bar Counsel issued a subpoena directing the attorney to appear in person on a specified date to respond to questions under oath and to produce bank records. See id. at 695-97, 255 A.3d at 1077. The attorney evaded service of the subpoena at her office and insisted that a process server had attempted to serve the wrong person in the wrong place. See id. at 695-97, 255 A.3d at 1077. Bar Counsel continued efforts to contact the attorney, leaving voicemails and sending e-mails and letters, advising of the date the statement under oath was to be given. See id. at 695-97, 255 A.3d at 1077. The attorney failed to provide a statement under oath as scheduled and did not contact Bar Counsel to explain her failure to appear. See id. at 695-97, 255 A.3d at 1077. We concluded that the attorney violated Rule 8.1(b) "by failing to provide dates

_____

the complaint and, when she finally responded, the attorney provided incomplete responses. See id. at 215, 164 A.3d at 217. The attorney also refused to return calls to Bar Counsel's investigator and when Assistant Bar Counsel requested that the attorney return the investigator's calls, the attorney replied that she would not do so. See id. at 215, 164 A.3d at 217-18 (citation omitted). We concluded that the attorney violated Rule 8.1(b) by knowingly failing to respond to lawful demands for information from Bar Counsel. See id. at 215, 164 A.3d at 218. See also Attorney Grievance Comm'n v. Gracey, 448 Md. 1, 26-27, 136 A.3d 798, 813-14 (2016) (We concluded that an attorney violated Rule 8.1(b) where the attorney "failed to timely respond to the initial complaint and failed to provide copies of the client file for the [clients] and trust account records.").

for her statement under oath, by evading service of the subpoena for her statement under oath, and by failing to appear for her statement under oath and deposition." Id. at 709, 255 A.3d at 1084-85.  Based on other circumstances, we concluded that the attorney also violated Rule 8.1(b) "by failing to respond in any manner to Bar Counsel's repeated requests for information regarding an attorney trust account[.]" Id. at 709, 255 A.3d at 1084.

Rule 8.1(b) does not define or otherwise describe what constitutes a "lawful demand for information from a[] disciplinary authority[.]"  We turn to Maryland Rule 19-712 to assess whether the Rule provides Bar Counsel with the authority to subpoena the attorney under investigation to provide a statement under oath.  At the time that Bar Counsel issued the subpoena in this case, Maryland Rule 19-712, concerning an investigative subpoena, provided in relevant part:

> **(a) Approval and Issuance.**
>> (1) The Chair of the Commission may authorize Bar Counsel to issue a subpoena to compel the attendance of witnesses and the production of designated documents or other tangible things at a time and place specified in the subpoena if the Chair finds that (A) the subpoena is necessary to and in furtherance of an investigation being conducted by Bar Counsel pursuant to Rule 19-711 or (B) the subpoena has been requested by a disciplinary authority of another jurisdiction pursuant to the law of that jurisdiction for use in a disciplinary or remedial proceeding in that jurisdiction to determine alleged professional misconduct or incapacity of an attorney subject to the jurisdiction of that disciplinary authority.
>> (2) Upon approval, Bar Counsel may issue the subpoena.
>
> **(b) Contents.**  A subpoena shall comply with the requirements of Rule 2-510 (c), except that to the extent practicable, a subpoena shall not identify the attorney under investigation.  A subpoena to compel attendance of a witness shall include or be accompanied by a notice that the witness (1) has the right to consult with an attorney with respect to the assertion of a privilege or any other matter pertaining to the subpoena and (2) may file a motion for

judicial relief under Rule 2-510.

> **(c) Service.** Except for service upon an attorney in accordance with Rule 19-708 (b), a subpoena shall be served in accordance with Rule 2-510. Promptly after service of a subpoena on a person other than the attorney under investigation and in addition to giving any other notice required by law, Bar Counsel shall serve a copy of the subpoena on the attorney under investigation.

As our recent decision in Dailey, 474 Md. at 707-11, 255 A.3d at 1084-85, demonstrates, Bar Counsel has used Maryland Rule 19-712 to issue a subpoena to an attorney under investigation to provide a statement under oath and we have concluded that an attorney violated Rule 8.1(b) by failing to respond to Bar Counsel's proposal of dates for her statement under oath, evading service of the subpoena, and failing to appear for the statement under oath and deposition.

In recent amendments to Maryland Rule 19-712 that became effective on October 1, 2021, we adopted language changing the word "witness" in the Rule to "person" and creating a section of the Rule providing for sanctions for an attorney under investigation who fails to comply with a subpoena from Bar Counsel. On April 8, 2021, the Rules Committee submitted its Two Hundred Seventh Report to this Court. See Rules Committee, Two Hundred Seventh Report at 1 (Apr. 8, 2021), available at https://www.mdcourts.gov/sites/default/files/rules/reports/207threport.pdf [https://perma.cc/YJ2A-EJ3C]. In Category 2, the Rules Committee proposed making revisions to Title 19, Chapter 700 of the Maryland Rules, *i.e.*, "the Rules dealing with Bar Counsel, the Attorney Grievance Commission (AGC), and proceedings relating to complaints made against attorneys." Id. at 6.

The Rules Committee proposed that Maryland Rule 19-712 be amended to provide

as follows (we have omitted the markup of deletions and additions, as indicated in the

report by strikethrough lines and underlining):

(a) Approval and Issuance

(1) The Chair of the Commission may authorize Bar Counsel to issue a subpoena to (A) compel the person to whom it is directed to attend, give testimony, and produce designated documents, electronically stored information, or other tangible things at a time and place specified in the subpoena, or (B) to compel the attorney to submit to a mental or physical examination by a suitably licensed or certified examiner.

(2) The Chair of the Commission may authorize a subpoena if the Chair finds that (A) the subpoena is necessary to and in furtherance of an investigation being conducted by Bar Counsel pursuant to Rule 19-711, 19-735, 19-751, or 19-752 or (B) the subpoena has been requested by a disciplinary authority of another jurisdiction pursuant to the law of that jurisdiction for use in a disciplinary or remedial proceeding in that jurisdiction to determine alleged professional misconduct or incapacity of an attorney subject to the jurisdiction of that disciplinary authority.

(3) Upon approval, Bar Counsel may issue the subpoena.

(b) Contents

(1) A subpoena shall comply with the requirements of Rule 2-510 (c), except that to the extent practicable, a subpoena shall not identify the attorney under investigation.  A subpoena to compel attendance of a witness shall include or be accompanied by a notice that the witness (1) has the right to consult with an attorney with respect to the assertion of a privilege or any other matter pertaining to the subpoena and (2) may file a motion for judicial relief under Rule 2-510.

(2) A subpoena to compel the attorney to submit to a mental or physical examination shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

(c) Service

(1) Generally

A subpoena shall be served in accordance with Rule 2-510 (d). Promptly after service of a subpoena on a person other than the attorney under investigation and in addition to giving any other notice required by law, Bar Counsel shall serve a copy of the subpoena on the attorney under investigation.

Cross reference: For examples of other notice required by law, see Code, Financial Institutions Article, § 1-304, concerning notice to depositors of subpoenas for financial records; Code, Health General Article, § 4-306 concerning disclosure of medical records; and Code, Health General Article, § 4-307, concerning notice of a request for issuance of compulsory process seeking medical records related to mental health services. See also Rule 19-411 (b), concerning notices required in connection with IOLTA accounts.

(2) Alternative Service

If after reasonable efforts the attorney cannot be served personally, service may be made on the attorney by sending by e-mail to all e-mail addresses of record maintained by the attorney with the Attorney Information System in accordance with Rule 19-802.

(d) Recording of Statements

All testimony by the subpoenaed witness shall be under oath and shall be contemporaneously recorded stenographically or by electronic audio or audio-video recording.

(e) Objection

The person served with the subpoena or the attorney under investigation may file a motion in the circuit court for the county in which the subpoena was served for any order permitted by Rule 2-510(e). The motion shall be filed promptly and, whenever practicable, at or before the time specified in the subpoena for compliance.

(f) Enforcement

(1) Order enforcing compliance

(A) If (i) the person served with a subpoena fails to file a timely motion under section (e) or the court denies such a motion, and (ii) the person fails to comply with the subpoena, Bar Counsel may file a motion in the circuit court for the county in which the subpoena was served for an order to enforce compliance with the subpoena.

(B) Papers filed in the circuit court pursuant to this subsection shall be sealed upon filing and shall be open to inspection only by order of the court. A hearing before the court shall be on the record and shall be conducted outside of the presence of all individuals other than Bar Counsel, the attorney, the judge, and those individuals whose presence the court deems necessary. Any transcript or recording of the proceedings shall be sealed.

(2) Petition for contempt

If a person willfully fails to comply with an order issued under subsection (f) (1), Bar Counsel may file a petition for contempt pursuant to

Rule 15-206 or for a body attachment pursuant to Rule 2-510(j).

(3) Other sanctions

If the person is the attorney who is the subject of the investigation, Bar Counsel may, in addition, (A) with the approval of the Chair of the Commission, file with the Court of Appeals a petition to suspend the attorney from practicing law pending compliance with the subpoena, and (B) file a statement of charges pursuant to Rule 19-718 for violation of Rule 19-308.1. The attorney may file a response to a petition for suspension within 15 days after service of the petition. The Court may decide the issue on the papers filed or shall hold an expedited hearing on the petition.

(g) Confidentiality

Any paper filed in the circuit court with respect to a subpoena shall be sealed upon filing and shall be open to inspection only by order of the court. A hearing before the court on any motion shall be on the record and shall be conducted out of the presence of all individuals other than Bar Counsel, the attorney, and those individuals whose presence the court deems necessary.

(h) Petition for Disciplinary or Remedial Action

(1) Generally

If the circuit court makes a finding of contempt pursuant to Rule 15-206, Bar Counsel, with the approval of the Chair of the Commission, may file a Petition for Disciplinary or Remedial Action in the Court of Appeals pursuant to Rule 19-721 (a) (1). A certified copy of the order of contempt shall be attached to the Petition, and a copy of the Petition and order shall be served on the attorney in accordance with Rule 19-723.

(2) Show Cause Order

When a petition and certified copy of an order of contempt have been filed, the Court of Appeals shall order that the attorney, within 15 days from the date of the order, show cause in writing why the attorney should not be suspended immediately from the practice of law until the further order of the Court of Appeals.

(3) Action by the Court of Appeals

Upon consideration of the petition and any answer to the order to show cause, the Court of Appeals may enter an order (1) immediately suspending the attorney from the practice of law, (2) designating a judge pursuant to Rule 19-722 to hold a hearing in accordance with Rule 19-727, or (3) containing any other appropriate provisions. The provisions of Rules 19-741 and 19-743 apply to an order under this section that suspends an attorney.

(4) Presumptive Effect of Order of Contempt

A finding of contempt is presumptive evidence that the attorney is in contempt of court, but the introduction of such evidence does not preclude Bar Counsel or the attorney from introducing additional evidence or

otherwise showing cause why no suspension should be imposed.

(5) Termination of Suspension

On notification by Bar Counsel that the attorney has purged the contempt, the Court of Appeals shall order the attorney reinstated to the practice of law, unless other grounds exist for the suspension to remain in effect.

(6) Other Disciplinary Proceedings

Proceedings under this Rule shall not preclude the use of the facts underlying the order of contempt when relevant to a pending or subsequent disciplinary proceeding against the attorney.

Id. at 92-98.

In a Rules Order dated July 8, 2021, this Court adopted the proposed amendments to Maryland Rule 19-712. Court of Appeals of Maryland, Rules Order at 1-3, 149-57 (July 8, 2021), available at https://www.mdcourts.gov/sites/default/files/rules/order/ro207.pdf [https://perma.cc/KJ9E-VNTL]. Accordingly, effective October 1, 2021, Maryland Rule 19-712 now provides, as the Rules Committee proposed, the language as set forth above. The amended Maryland Rule 19-712(a)(1) expressly states that Bar Counsel can issue a subpoena to "compel the person to whom it is directed[,]" which would include an attorney under investigation, to attend, give testimony under oath, and produce designated documents, electronically stored information, or other tangible things at the time and place specified in the subpoena. The amended Maryland Rule 19-712(f) also sets forth specific methods of enforcement that would apply when the attorney under investigation is the person subpoenaed.

In light of our holding in Dailey, the language of Maryland Rule 19-712 that was in effect at the time that Bar Counsel issued the subpoena to Cassilly, as well as the recent amendment to Maryland Rule 19-712, we sustain Bar Counsel's exception and determine

that clear and convincing evidence supports the conclusion that by failing to take the oath and provide a statement in compliance with the subpoena, Cassilly knowingly failed to respond to a lawful demand for information from a disciplinary authority in violation of Rule 8.1(b). Cassilly did not file a motion objecting to the subpoena or otherwise move to quash the subpoena or seek a protective order. Instead, Cassilly appeared at the time and place designated in the subpoena but refused to take the oath because, as he testified at the disciplinary hearing, he would not permit Bar Counsel to ask him "about stuff from 20 years ago" of which he had claimed to have no accurate recollection. As such, Cassilly willfully failed to comply with the subpoena, which constituted a knowing failure to respond to a lawful demand for information.

### Rule 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation)

The hearing judge concluded that, just as Cassilly violated Rule 3.3(a)(1), he violated Rule 8.4(c). The hearing judge determined that "[t]he facts supporting the conclusion that [Cassilly] violated Rule 3.8(d) also support the conclusion that he violate[d] Rule 8.4(c)." (Citation omitted).

Rule 8.4(c) provides that "[i]t is professional misconduct for an attorney to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" In Steinhorn, 462 Md. at 198-99, 198 A.3d at 829, we observed that "[t]here is significant overlap between [Rules] 3.3(a)(1) and 8.4(c). Indeed, a lawyer that violations [Rule] 3.3(a) generally violates [Rule] 8.4(c) as well." (Cleaned up).

Clear and convincing evidence supports the hearing judge's conclusion that Cassilly violated Rule 8.4(c). In making four statements of fact that he knew to be false to the

circuit court concerning the Robertson Report, Cassilly engaged in conduct involving intentional dishonesty in violation of Rule 8.4(c). At the time that Cassilly made all of the false statements, he was already aware of the Tobin Memorandum, the 1997 Report from the OIG, and Thompson's 1997 letter, and, as such, he was aware that Agent Malone's testimony in the Hastings matter had been challenged. According to Jabloner, Cassilly had decided to wait to see if Huffington would file postconviction motions before deciding whether to disclose the information he knew at that time. After that, Cassilly received the Robertson Report and Thompson's 1999 letter. So, the evidence supports the conclusion that, when Cassilly made the statements to the circuit court in response to the petition for a writ of actual innocence and at the hearing on the petition that there was no indication that Agent Malone's testimony was incorrect, he engaged in intentional dishonesty. Similarly, on the two occasions that Cassilly told the circuit court that it had been determined that Agent Malone's testimony was proper, he was well aware that that was not the case. At that point, in addition to all of the reports discussed above, Cassilly had received Wong's 2014 DOJ letters. So, in 2016 and 2017, despite having received the 2014 DOJ letters that advised that exactly the opposite had been determined, Cassilly specifically advised the circuit court that the FBI and DOJ had reviewed Agent Malone's testimony and determined no problems had been found. Cassilly clearly engaged in intentionally dishonest conduct on those two occasions as well.

### Rule 8.4(d) (Conduct that is Prejudicial to Administration of Justice)

The hearing judge concluded that Cassilly's "conduct which gave rise to violations of Rules 3.3, 3.4, 3.8([d]), [] and 8.4(c) also constitutes a violation of Rule 8.4(d)." The

hearing judge observed that, "[a]t all times in question, [Cassilly] was the elected State's Attorney for Harford County[,]" and explained that "[p]rosecutors must be 'held to even higher standards of conduct than other attorneys due to their unique role as both advocate and minister of justice.'" (Quoting Attorney Grievance Comm'n v. Gansler, 377 Md. 656, 697, 835 A.2d 548, 572 (2003)).

"It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice[.]" R. 8.4(d). "Generally, a lawyer violates [Rule] 8.4(d) where the lawyer's conduct would negatively impact the perception of the legal profession of a reasonable member of the public." Slate, 457 Md. at 645, 180 A.3d at 155 (cleaned up).

Clear and convincing evidence supports the hearing judge's conclusion that Cassilly violated Rule 8.4(d). Here, in his role as State's Attorney for Harford County, Cassilly, among other misconduct, knowingly made false statements of fact to the circuit court on multiple occasions, engaged in intentional dishonesty, concealed from Huffington and his counsel the Robertson Report, and sought to destroy the evidence that was the subject of the report. With this misconduct, Cassilly engaged in misconduct that the public would not expect from a member of the legal profession, especially the State's Attorney of a jurisdiction, and that would negatively impact the perception of the legal profession of a reasonable member of the public.

### Rule 8.4(a) (Violating the Rules of Professional Conduct)

"It is professional misconduct for a lawyer to[] violate . . . the [] Rules of Professional Conduct[.]" R. 8.4(a). Clear and convincing evidence supports the hearing

judge's conclusion that Cassilly violated Rule 8.4(a). As discussed above, Cassilly violated

Rules 3.3(a)(1), 3.4(a), 3.8(d), 8.1(b), 8.4(c), and 8.4(d).

### (D) Sanction

Bar Counsel recommends that we disbar Cassilly. Cassilly recommends that we

dismiss all charges against him because, according to him, his "actions did not violate any

disciplinary rule and were not unethical."[27]

In Slate, 457 Md. at 646-47, 180 A.3d at 155-56, this Court stated:

> This Court sanctions a lawyer not to punish the lawyer, but instead to protect the public and the public's confidence in the legal profession. This Court accomplishes these goals by: (1) deterring other lawyers from engaging in similar misconduct; and (2) suspending or disbarring a lawyer who is unfit to continue to practice law.
>
> In determining an appropriate sanction for a lawyer's misconduct, this Court considers: (1) the MLRPC that the lawyer violated; (2) the lawyer's mental state; (3) the injury that the lawyer's misconduct caused or could have caused; and (4) aggravating factors and/or mitigating factors.

---

[27]We are aware that, in her opinion, the hearing judge recommended that Cassilly be given a reprimand. The hearing judge's recommendation as to a sanction causes us to reiterate what we stated in Attorney Grievance Comm'n v. Floyd, 400 Md. 236, 250 n.4, 929 A.2d 61, 69 n.4 (2007):

> While this Court appreciates the diligence by which this judge and all of the other judges approach their tasks in finding the facts and making conclusions of law and identifying mitigating and aggravating circumstances in Attorney Grievance matters, we encourage them to refrain from making recommendations regarding sanctions, no matter how much a party entreats them to do so. See Md. Rule 16-752(a) (defining the authority of Court of Appeals to enter an order designating a circuit court judge to conduct an evidentiary hearing); id. at 16-757(c) (defining the duties of the hearing judge, but including no authority to recommend sanctions).

Former Maryland Rule 16-752(a) is now Maryland Rule 19-722(a) and former Maryland Rule 16-757(c) is now Maryland Rule 19-727(e).

- 89 -

Aggravating factors include: (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the MLRPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

Mitigating factors include: (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

(Cleaned up).

Cassilly violated Rules 3.3(a)(1), 3.4(a), 3.8(d), 8.1(b), 8.4(c), and 8.4(d). As the hearing judge's findings of fact demonstrate, between 1999 and 2011, Cassilly, who was the State's Attorney for Harford County, knowingly and intentionally failed to disclose the Robertson Report to Huffington. Rather, Cassilly, who received the Robertson Report in 1999, discarded the Robertson Report and, at various points over a period of years, misrepresented the content of the report to the circuit court and Huffington on numerous

occasions. Moreover, in 2003, when Huffington, who was still unaware of the Robertson Report, filed a petition to preserve the forensic evidence in his case and to conduct DNA testing, Cassilly continued to fail to disclose the report, opposed the petition, and sought permission from the court to destroy the forensic evidence that Huffington wanted to have tested. In 2010, when Huffington, who was still unaware of the Robertson Report, filed the petition for a writ of actual innocence arguing that Agent Malone's false and misleading testimony in the Hastings case constituted newly discovered evidence that discredited Agent Malone, Cassilly opposed the petition and falsely stated that no evidence had been presented that Agent Malone's testimony in the case was "not correct." In 2014, Cassilly received the 2014 DOJ letters advising that Agent Malone's testimony in the case exceeded the limits of science. Nonetheless, in 2016 and 2017, Cassilly knowingly and deliberately misrepresented to the circuit court and Huffington's counsel that the DOJ and FBI had conducted investigations and found nothing wrong with Agent Malone's testimony. Later, during Bar Counsel's investigation, Cassilly knowingly failed to respond to a lawful demand for information from Bar Counsel by refusing to comply with a subpoena ordering him to provide a statement under oath.

In making false statements of fact and engaging in dishonesty with respect to the content of the Robertson Report and the 2014 DOJ letters, Cassilly engaged in knowing and intentional misconduct. Cassilly's misconduct injured Huffington, who was unaware of the Robertson Report for over a decade, thus depriving him of the ability to seek postconviction relief earlier on grounds arising from issues related to Agent Malone's testimony in his case.

Bar Counsel excepts to the hearing judge's failure to find any aggravating factors. Bar Counsel contends that Cassilly's misconduct is aggravated by five factors. First, Bar Counsel argues that Cassilly "demonstrated a dishonest motive when he failed to disclose the Robertson Report, disposed of the report, and then sought to destroy the evidence that was the subject of the report" and "when he made multiple knowingly false statements to the circuit court regarding the Robertson Report and [] Thompson's 1999 letter." Second and third, Bar Counsel asserts that Cassilly engaged in a pattern of misconduct for nearly twenty years and he committed multiple offenses. Fourth, Bar Counsel maintains that Cassilly failed to acknowledge the wrongful nature of his misconduct. Finally, Bar Counsel contends that Cassilly has substantial experience in the practice of law, as he was admitted to the Bar of Maryland in 1977 and served as the elected State's Attorney for Harford County from January 3, 1983 until his retirement in January 2019. Although the hearing judge made no specific findings with respect to aggravating factors, the findings of fact set forth in the opinion substantiate the five aggravating factors urged by Bar Counsel. We sustain Bar Counsel's exception and find the five aggravating factors.

We determine the same two mitigating factors as the hearing judge—good reputation and the absence of prior attorney discipline.

In Attorney Grievance Comm'n v. Vanderlinde, 364 Md. 376, 418, 773 A.2d 463, 488 (2001), we announced:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree

as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

Disbarment ordinarily should be the sanction for intentional dishonest conduct. With our opinion today, we impress upon the members of the bar that the Court does not consider [certain prior] cases to be authority for an argument for leniency in attorney disciplinary matters involving intentionally dishonest conduct.

We explained that only compelling extenuating circumstances would justify a sanction less than disbarment in cases of intentional dishonest conduct, stating:

[We hold] that, in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the [Rules of Professional Conduct]. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

Id. at 413-14, 773 A.2d at 485 (emphasis in original).

We recently reiterated in Miller, 467 Md. at 228, 223 A.3d at 1006, that "disbarment is generally the appropriate sanction for intentionally dishonest conduct, unless an attorney can establish the existence of compelling extenuating circumstances justifying a lesser sanction." (Cleaned up). In Attorney Grievance Comm'n v. Cocco, 442 Md. 1, 13, 109 A.3d 1176, 1183 (2015), this Court stated that, "[t]ime and again, we have reached the conclusion that disbarment is the appropriate sanction for intentional misrepresentations, particularly when they cast disrepute upon the public perception of lawyers." (Citations omitted). And, in Attorney Grievance Comm'n v. Framm, 449 Md. 620, 667, 144 A.3d 827, 855 (2016), we stated: "Our cases have long established that, when an attorney's

misconduct is characterized by repeated material misrepresentations that constitute a pattern of deceitful conduct, as opposed to an isolated instance, disbarment follows as a matter of course." (Cleaned up). Notably, "[t]his rule is not limited to cases involving misappropriation or criminal conduct." Id. at 667, 144 A.3d at 855. Rather, "[w]hen a pattern of intentional misrepresentations is involved, particularly those misrepresentations that attempt to conceal other misconduct by the attorney, disbarment will ordinarily be the appropriate sanction." Id. at 667, 144 A.3d at 855.

An examination of Cassilly's misconduct, including his various instances of intentionally dishonest misconduct which consisted of knowingly making false statements to the circuit court and Huffington's counsel, demonstrates that, under Vanderlinde and its progeny, disbarment is warranted. The very basic premise undergirding our holding in Vanderlinde and other cases involving intentional dishonesty is that we must protect the public and deter lawyers from engaging in intentional dishonesty of the type that Cassilly engaged in. The two mitigating factors in this case—good reputation and lack of prior attorney discipline—do not constitute compelling extenuating circumstances, or mitigation for that matter, which would result in a sanction less than disbarment.

It is significant that Cassilly intentionally failed to disclose exculpatory evidence as a prosecutor for over a decade. Although we have not addressed a prosecutor's violation of Rule 3.8(d) in an attorney disciplinary matter, we have explained that "[p]rosecutors play a unique role in our system of criminal justice" and "are held to even higher standards of conduct than other attorneys due to their unique role as both advocate and minister of justice." Gansler, 377 Md. at 697, 835 A.2d at 572 (cleaned up). As we have stated, a

"prosecutor's duty is not merely to convict, but to seek justice.  His obligation is to protect not only the public interest but the innocent as well and to safeguard the rights guaranteed to all persons, including those who may be guilty."  Id. at 698, 835 A.2d at 572 (cleaned up).  By way of comparison, we observe that ABA Standard 5.22 of the ABA Standards for Imposing Lawyer Sanctions provides that "[s]uspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process[.]"  ABA Standard 5.22 (1992), available at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/sanction_standards.pdf  [https://perma.cc/JJ6B-ZK3Y].  The trust placed in Cassilly as the elected State's Attorney for Harford County, and the high standard to which prosecutors are held, renders Cassilly's misconduct much more egregious than that of a lawyer in an official or government position who simply fails to follow proper procedures or rules.[28]

---

[28]ABA Standard 5.21 of the ABA Standards for Imposing Lawyer Sanctions provides:

> Disbarment is generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another, or with the intent to cause serious or potentially serious injury to a party or to the integrity of the legal process.

ABA Standard 5.21 (1992), available at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/sanction_standards.pdf [https://perma.cc/JJ6B-ZK3Y].  Cassilly's conduct more appropriately falls within the description of conduct for which the ABA Standards would prescribe disbarment. Intentionally failing to disclose information that tends to negate guilt amounts to a misuse of a prosecutor's position as a "minister of justice" and is injurious to the integrity of the criminal justice system.

To be sure, Cassilly retired as State's Attorney in January 2019 and voluntarily assumed inactive/retired status after his retirement pursuant to Maryland Rule 19-605(b). The record in the case does not indicate that this Court has issued an order pursuant to any Maryland Rule placing Cassilly on inactive status, *i.e.*, nothing in the record indicates that Cassilly's retirement was anything other than a voluntary retirement that he accomplished himself by initiating the process with the Client Protection Fund. Even though Cassilly has voluntarily assumed inactive/retired status, absent action against him pursuant to Chapter 700 of Title 19 of the Maryland Rules (such as a sanction ordered by this Court), pursuant to Maryland Rule 19-605(b)(2), Cassilly may still engage in the practice of law without payment to the Client Protection Fund if:

> (A) the attorney is on inactive/retired status solely as a result of having been approved for that status by the trustees of the Fund and not as a result of any action against the attorney pursuant to the Rules in Chapter 700 of this Title, and (B) the attorney's practice is limited to representing clients without compensation, other than reimbursement of reasonable and necessary expenses, as part of the attorney's participation in a legal services or pro bono publico program sponsored or supported by a local bar association, the Maryland State Bar Association, an affiliated bar foundation, or the Maryland Legal Services Corporation.

Even when an attorney who has engaged in misconduct voluntarily assumes inactive/retired status, the need to protect the public and deter other attorneys from similar misconduct exists. In Attorney Grievance Comm'n v. Markey, 469 Md. 485, 524, 230 A.3d 942, 964 (2020), where one attorney had voluntarily assumed inactive/retired status and the other was decertified and temporarily suspended from the practice of law in Maryland, we nonetheless indefinitely suspended both attorneys from the practice of law in Maryland for violations of the MLRPC. Upon consideration of a "Motion for

Reconsideration of Effective Date of Sanction Imposed" filed by Bar Counsel, we revised the sanction and ordered that both attorneys' indefinite suspensions take effect immediately rather than become effective later in the event the attorneys were to regain active status. Id. at 525, 230 A.3d at 965.

Foregoing the sanction of disbarment because of the circumstance that Cassilly has voluntarily assumed inactive/retired status with the Client Protection Fund would ignore the basic tenet that a sanction is imposed not to punish an attorney "but instead to protect the public and the public's confidence in the legal profession." Slate, 457 Md. at 646, 180 A.3d at 155 (citation omitted). We accomplish those goals by "deterring other lawyers from engaging in similar misconduct" and "suspending or disbarring a lawyer who is unfit to continue to practice law." Id. at 646, 180 A.3d at 155 (citation omitted). In this case, disbarment recognizes the seriousness of Cassilly's misconduct and serves the goal of protecting the public and ensuring the public's confidence in the legal profession by deterring other attorneys from engaging in similar misconduct. Moreover, in imposing the sanction of disbarment, we protect the public by curtailing Cassilly's ability to resume active attorney status (which would not require the permission of this Court) or to practice law in accord with Maryland Rule 19-605(b)(2) while in inactive/retired status.

For the reasons set forth herein, we disbar Cassilly. Although Cassilly is in inactive/retired status, his disbarment will be effective immediately.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF**

**THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOSEPH IGNATIUS CASSILLY.**

Circuit Court for Harford County
Case No. C-12-CV-20-000648

Argued: September 9, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 31

September Term, 2020
_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JOSEPH IGNATIUS CASSILLY
_____

Getty, C.J.
McDonald
Watts
Hotten
Booth
Biran
Battaglia, Lynne A.
(Senior Judge, Specially
Assigned),

JJ.
_____

Concurring Opinion by McDonald, J.
_____

Filed: October 22, 2021

When a hearing judge in a disciplinary case finds that an attorney has made knowingly false statements to a court concerning a material matter, disbarment is likely to follow. That sanction is not inevitable,[1] but more is expected of one who speaks on behalf of the sovereign. *See Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 46 (2014). Thus, once the hearing judge found that Mr. Cassilly made knowingly false statements to the court concerning matters material to the prosecution of Mr. Huffington, his fate was sealed – unless he could establish that the judge's findings were clearly erroneous. That is a steep hill to climb and I concur in the Court's conclusion that he did not succeed.

I write only with respect to the finding of a violation of Rule 3.8(d). I note that, although Bar Counsel had urged the Court to hold that the scope of that rule exceeds that of the prosecutor's discovery obligations under *Brady v. Maryland* and its progeny, the Court has not reached that conclusion in this case. *See* Majority slip op. at 77 & n.25. Indeed, as noted by the hearing judge in another recent disciplinary case in Maryland, there is a significant split in the case law on that question in other jurisdictions that have the same rule. *See Attorney Grievance Comm'n v. Miller*, Misc. AG No. 59 (Sept. Term 2020), No. 484418-V (Mont. Co. Cir. Ct.). That judge's excellent and thorough analysis can be found at https://perma.cc/84XY-VVFX.[2] There is also significant commentary in the academic

---

[1] *E.g.*, *Attorney Grievance Comm'n v. Keating*, 471 Md. 614 (2020) (sanction of indefinite suspension with right to reapply in six months when attorney made knowingly false statement in attesting to will submitted to Orphans' Court).

[2] In *Miller*, the hearing judge concluded that the respondent attorney had not violated Rule 3.8(d), regardless of whether or not the rule exceeded the scope of *Brady*. Bar Counsel did not except to that conclusion and, in an order dated September 13, 2021, we dismissed the petition for disciplinary action in that case.

literature as to whether the ethical rule should be construed to impose duties as to discovery beyond those imposed by *Brady* and other criminal discovery rules. *See, e.g.,* Michael D. Ricciuti, et al., *Criminal Discovery: The Clash Between Brady and Ethical Obligations*, 51 Suffolk U. L. Rev. 399 (2018); Kirsten M. Schimpff, *Rule 3.8, the Jencks Act, and How the ABA Created a Conflict Between Ethics and the Law on Prosecutorial Disclosure*, 61 Am. U. L. Rev. 1729 (2012). However, this Court's determination of that issue regarding the scope of Rule 3.8(d) remains for another day.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/31a20agcn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/31a20agcn2.pdf